**In re WHITE MOTOR CORPORATION, Debtor.**

**Arthur MAZIROW, Appellant,**

v.

**John T. GRIGSBY, Jr., Disposition Assets Trustee, Appellee.**

**Civ. A. No. C84–1700.**

United States District Court, N.D. Ohio, E.D.

Nov. 28, 1984.

Richard L. Phillips, Benesch, Friedlander, Coplan & Aronoff, Cleveland, Ohio, for appellant.

David C. Weiner, Deborah A. Coleman, Hahn, Loeser, Freedheim, Dean & Wellman, Cleveland, Ohio, for appellee.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

The question of first impression presented in this interlocutory bankruptcy appeal is whether a debtor who obtains a court order rejecting an executory contract under 11 U.S.C. § 365(g) is foreclosed from raising certain defenses to a creditor's claims arising out of the rejection.

The District Court's appellate jurisdiction rests on 28 U.S.C. § 158,[1] as enacted by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98–353, 98 Stat. 333.

## I.

Arthur Mazirow, a Los Angeles lawyer, negotiated a contract with the White Motor Corporation ("White") in the summer of 1980 under which White agreed to enter into sale-leaseback arrangements for eleven parcels of real estate, located throughout the United States, which were owned and used by White or its affiliates. On September 4, 1980, White filed a petition for reorganization with the Bankruptcy Court pursuant to Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101 *et seq.* The subsequent nullification of the White-Mazirow contract gives rise to this action.

### A.

As its financial problems worsened in 1980, White decided to raise operating capital by selling and leasing back various parcels of real estate used by it or its affiliates. In April of 1980, White entered into purchase agreements with Equitec Financial Group, Inc. ("Equitec") for a total of twelve properties. Four months later, when Equitec expressed uncertainty about its ability to close the purchase of any of these properties, White sent a letter, dated July 16, 1980, to Mazirow, committing itself to selling eleven of the parcels.

After White informed him of Equitec's final decision not to buy the properties, on July 30, 1980, Mazirow—who had just completed the purchase of two White properties in greater Dallas, Texas—sent a letter to G.R. Richards, the Secretary of White, stating:

This letter is to advise you that I do hereby exercise the option to purchase all of the properties described and mentioned in the letter to me dated July 16, 1980 ...

I will be in contact with you with reference to all of the necessary documentation.

After July 30, at Mazirow's request, he and White modified the closing time and price for the eleven properties. They agreed that the first property to be sold would be a parcel in Birmingham, Alabama. On August 15, 1980, they executed a lengthy written agreement with escrow instructions. On August 29, White sent to Mazirow executed copies of a Standard Industrial Lease (dated August 15) and an Agreement of Purchase and Escrow Instructions (dated August 29). An accompanying letter confirmed certain "supplemen-

---

**1.** Title 28 U.S.C. § 158 provides in pertinent part:

(a) The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees, and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

\* \* \* \* \* \*

(c) An appeal under subsection[ ] (a) ... of this section shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts and in the time provided by Rule 8002 of the Bankruptcy Rules.

tal understandings" reached between the parties after July 30.

Mazirow received and accepted the letter and instruments on September 2, 1980, and returned them to White on September 3, by express mail, so that the closing on the Birmingham property could take place on Friday, September 5. Mazirow's letter stated:

I am herewith delivering to you the following documents:

1. A fully executed copy of the "Agreement of Purchase and Escrow Instructions" dated August 15, 1980 with all the changes that we agreed upon during our telephone conversation of September 2, 1980;

2. A fully executed copy of the Lease dated August 15, 1980, concerning the above entitled property marked "Duplicate Original" in red; and

3. A copy of your letter dated August 29, 1980 addressed to me which I have executed.

The only open item that I can think of concerning this matter is the issuance of the Certificate of Liability Insurance and Casualty Insurance.

In order that we may close the transaction on Friday, I would appreciate your making every effort to get the insurance certificate to me.

As of September 4, 1980, Mazirow had delivered all necessary documents in connection with the closing of the Birmingham property into escrow at Lawyers' Title Insurance Corporation in Los Angeles.

B.

At 4:49 p.m. on September 4, 1980, White filed its petition for reorganization with the Bankruptcy Court. The following day, White instructed the escrow agent "not to close the sale and leaseback of the [Birmingham] property nor deliver the deed for that property until you have received further instructions." G. Robert Richards of White also spoke to Mazirow on that day. Mazirow apparently wrote to White on September 8 with certain suggestions; on September 12, Richards responded by writing to Mazirow in part:

I have your letter of September 8, and want to respond immediately to avoid any misunderstanding with respect to the position of White Motor Corporation.

On September 5, we discussed White's chapter 11 filing of the previous day. It was stated that we believed White could not proceed to close any of the eleven transactions without the approval of the Court and interested creditors. I suggested that rather than to immediately return papers in escrow, etc., we wait until the dust settled.

During that conversation, you suggested that White's creditors might want us to complete the transactions. We, of course, have no way of ascertaining their desire at this time, nor have we had an opportunity to fully review our own thoughts under chapter 11 conditions and the details of a plan of the reorganization which will ultimately emerge. You were not, however, nor are you now, being asked to forego what you may perceive to be in your own best interests.

As the dust settled, White declined to perform its obligations to enter into the sale-leaseback arrangements with Mazirow. Instead, it included the properties in a Purchase Agreement, dated June 9, 1981, between White, one of its affiliates, Gemini Manufacturing Company, and AB Volvo, under which White sold the properties in question to Volvo. On June 11, 1981, Mazirow commenced an adversary proceeding in the Bankruptcy Court seeking to require White to specifically perform the sales and leases set forth in the Agreement of July 16, 1980. White asked the court for approval of rejection of the contract on August 10, 1981; ten days later, the bankruptcy judge signed an order, prepared by White, which states in part:

### FINDINGS OF FACT

1. The Mazirow Contract is an executory contract within the meaning of § 365 of the Bankruptcy Code.

2. The Mazirow Contract is burdensome and onerous to the estate of WMC.

AND, IT IS THEREFORE:

ORDERED, that the Mazirow Contract be, and it hereby is, rejected and disaffirmed pursuant to § 365 of the Bankruptcy Code, and it is further

ORDERED, that Mazirow may file such claim, if any, as he may assert for any and all damages arising out of such rejection and disaffirmance not later than ninety (90) days from the date of written notice to Mazirow of the closing, if any, of the transactions contemplated by the Purchase Agreement dated June 9, 1981, between [White Motor], Gemini Manufacturing Co., White Motor International, Inc. and AB Volvo (the "Purchase Agreement"), without prejudice to [White's] right to object thereto, and it is further

ORDERED, that this order shall become effective only upon the closing of the Purchase Agreement.

The White-Volvo Purchase Agreement closed in timely fashion, and on January 26, 1982, Mazirow filed a timely proof of claim.

A series of skirmishes concerning the Mazirow claim then commenced in the Bankruptcy Court. White filed on March 2, 1983 an Application regarding Objections to Claim of Arthur Mazirow, objecting to the claim and seeking to expunge it. Mazirow moved to strike the application, contending that the nullification of the contract constituted a breach thereof, leaving only the question of damages to be litigated. White also filed a request for production of documents relevant to Mazirow's financial condition; Mazirow filed a response objecting to the request as irrelevant, overly broad, and not within the scope of Fed.R.Civ.P. 26. After a hearing, the Bankruptcy Court denied Mazirow's Motion to Strike in an Order of September 30, 1983, stating that:

> An order authorizing the debtor-in-possession to reject an executory contract does not constitute *res judicata* as to the

questions of who failed to perform a contract or who breached the contract. These objections remain to be determined in the context of the objection to a claim, such as the one filed herein by White Motor Corporation....

White then moved for an order compelling discovery and for sanctions against Mazirow. The claimant then moved for partial summary judgment and a protective order barring the discovery. In an Order of March 26, 1984, the court reiterated its position "that neither the breach imposed by Section 365(g) nor the doctrine of *res judicata* precludes debtor's objection to the claim based on Mazirow's alleged pre-petition breach or inability to perform the rejected contract." It therefore denied Mazirow's motion for partial summary judgment and motion to compel.[2]

Mazirow then moved for leave to file an interlocutory appeal. On May 4, 1984, this Court granted leave to appeal the following question, as posed by the appellant:

> ... [W]hether, under § 365(g), 541(e), 502(g), and 502(b)(1) of the Bankruptcy Code, the performance or ability to perform of a non-debtor party to a contract rejected pursuant to § 365 of the Bankruptcy Code constitute a basis for the defense to the allowance of a claim based on such rejected contract.

## II.

### A.

Mazirow's analysis of the legal implications of the Bankruptcy Court's August 20, 1981 Order begins with the proper statement that the Order expressly determined there to be an executory contract between Mazirow and White, then nullified the contract. By seeking this nullification, nearly a year after filing its petition for reorganization, White is said to have abandoned the defenses it had raised to Mazirow's complaint pursuant to 11 U.S.C. § 541(e).[3]

**2.** Following the Bankruptcy Court's November 18, 1983 order approving White's Second Modified Plan of Reorganization, as amended, the White estate's assets were transferred to John T.

Grigsby, Jr., the Disposition Assets Trustee ("Trustee"), who is the appellee in this action.

**3.** Title 11 U.S.C. § 541(e) provides:

The rejection of the contract took place pursuant to 11 U.S.C. § 365(g), which provides:

(g) Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—

(1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, or 13 of this title, immediately before the date of the filing of the petition ...

"The Bankruptcy Code specifies that the rejection of an executory contract which had not been assumed constitutes a breach of the contract which relates back to the date immediately preceding the filing of a petition in bankruptcy. 11 U.S.C. § 365(g)(1)." *NLRB v. Bildisco and Bildisco,* —— U.S. ——, ——, 104 S.Ct. 1188, 1198, 79 L.Ed.2d 482 (1984). Mazirow contends that the "breach" then created a claim against the estate for the purpose of sharing in a distribution of the estate's assets, to be determined under 11 U.S.C. § 502—specifically, §§ 502(b)(1) and 502(g) which provide:

(b) Except as provided in subsections (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

(1) such claim is unenforceable against the debtor, and unenforceable against property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured ...

\*       \*       \*       \*       \*       \*

(g) A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b) or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

Contending that § 365(g) conclusively determines the debtor to be in breach of the rejected contract, Mazirow argues that "'applicable law' as employed by § 502(b)(1) must be interpreted to mean only those defenses *extrinsic* and not contradictory to the finding of a breach on the part of the debtor." Brief of Appellant at 5. He goes on to argue that the term "breach" in § 365(g) is unambiguous, is deliberately different from the term "nonperformance" used elsewhere in § 365, cannot be read otherwise without rendering the statute meaningless, and has been uniformly construed as providing for a breach on the part of the debtor upon rejection of an executory contract—a construction which Mazirow insists is consistent with the legislative history of all the applicable sections of the Code. Having reached this conclusion on the issues of Code interpretation, Mazirow argues that choice-of-law principles compel application of California contract law, which in turn compels the conclusion that White "by its breach is precluded from inquiring into the Appellant's performance or ability to perform" concerning the eleven properties, *Id.* at 14, so that he must be granted partial summary judgment.

The Trustee claims that Mazirow's interpretation of the Code would confer "a preferred status on persons with claims arising out of the rejection of a contract by foreclosing the estate from raising contract defenses after the contract is rejected." Appellee's Brief at 5. He proposes that the "principal thrust" of § 365(g) "is to establish that claims arising from the rejection of a contract are prepetition claims." *Id.*

(e) The estate shall have the benefit of any defense available to the debtor as against an entity other than the estate, including statutes of limitation, statutes of frauds, usury, and other personal defenses. A waiver of any such defense by the debtor after the commencement of the case does not bind the estate.

Since neither § 365(g) nor any other Code provision expressly states that rejection of an executory contract constitutes a valid, unchallengable claim against the debtor's estate, the Trustee argues, no such conclusion should be reached through an overbroad interpretation of the term "breach". Instead, he suggests that § 365(g) "may be understood to state that the rejection of an executory contract is a default for which the contracting party has a prepetition claim, but such rejection does not, as a matter of law, create an irrebutable presumption of a valid claim." *Id.* at 7. To hold otherwise "annuls Section 502(g) and renders Section 502(b)(1) meaningless for claims based upon rejection of contract ...." *Id.* at 6–7.

Focusing on § 502(b)(1), the Trustee contends that the "agreement" which renders a claim unenforceable "under any agreement or applicable law" may be the White-Mazirow contract itself. Furthermore, he urges a broad reading of the statute that does not distinguish between "extrinsic" and "intrinsic" defenses, relying on language in the statutory history which deems "failure of consideration"—an intrinsic defense—a basis for disallowing a claim. Section 502(g) leaves the Trustee with "the right to object to any claim filed against the estate, including, specifically, claims arising from rejection of an executory contract." *Id.* at 9. Those objections having been raised, the Trustee also requests that, if this Court accepts Mazirow's arguments on questions of Code interpretation, it should defer ruling on the choice-of-law and state law issues necessary to resolve the legal significance of the "breach" of the White-Mazirow contract until the Bankruptcy Court tackles those questions in the first instance.

B.

Existing case law under the Code provides little guidance in analyzing this case of first impression. Prior opinions establish that the rejection of an executory contract under § 365(g) is a breach of contract which gives rise to an action for damages by those parties adversely affected by such rejection.[4] *See, e.g., Robertson v. Pierce (In re Chi-Feng Huang),* 23 B.R. 798, 803 (Bankr. 9th Cir.1982); *In re Commercial Motor Freight, Inc. of Indiana,* 27 B.R. 293 (Bankr.S.D.Ind.1983). However, while Mazirow rightly contends that no reported decision upholds the proposition that rejection of an executory contract does not constitute breach of the contract, the trustee is correct in arguing that neither § 365(g) nor any other portion of the Code expressly states that the rejection of an executory contract establishes, as a matter of law, an irrebutable presumption that a valid claim exists against the debtor's estate.

Section 365, the nexus of the present dispute, was carefully drafted to maintain a delicate balance between debtors' and creditors' rights. The provision must be viewed both as "an integral facet of the bankrupt's ability to restructure its business operations into an economically viable format" and "as a subpart of contract law", under which "contract remedies are designed to ensure that the injured party receives the benefit of its bargain according to the contract's own terms." Nimmer, *Executory Contracts in Bankruptcy: Protecting the Fundamental Terms of the Bargain,* 54 U.Colo.L.Rev. 507, 513–15 (1983). Stated another way, "the general

---

4.  " 'Executory contract' is not defined in either § 101 or § 365 of the Bankruptcy Code, nor was there a statutory definition in the Bankruptcy Act of 1898. Development of this concept has therefore been a result of case decisions." *The Record Company, Inc. v. Bummbusiness, Inc. (In re The Record Company, Inc.),* 8 B.R. 57, 59 (Bankr.S.D.Ind.1980). A frequently-used definition is that

... [an] executory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other. Countryman, *Executory Contracts in Bankruptcy (pt. 1),* 57 Minn.L.Rev. 439, 460 (1973); *Benevides v. Alexander (In re Alexander),* 670 F.2d 885 (9th Cir.1982); *Bankers' Trust Co. v. Gibbons (In re Chicago, Rock Island, & Pacific R.R. Co.),* 604 F.2d 1002 (7th Cir.1979); *Northwest Airlines, Inc. v. Klinger (In re Knutson),* 563 F.2d 916 (8th Cir.1977).

theme of Section 365 is that the other party to an executory agreement has no protectable interest that offsets the bankruptcy interest of dispensing with burdensome or inconsequential property. The primary protection for the nonbankrupt party lies in the basic contract law right to recover for damages.... Section 365 must balance the internal bankruptcy goals (e.g., optimal distribution to creditors, promotion of rehabilitation) with general contract law policies that encourage or reinforce use of contractual relationships." *Id.* at 521–22. Moreover, protecting the interest of the nondebtor party to the executory contract also serves "to facilitate contractual activity by financially distressed debtors who have not yet filed in bankruptcy." *Id.* at 553.

■ Consequently, while one purpose of § 365(g)(1) "is to treat rejection claims as prepetition claims," H.R.Rep. No. 595, 95th Cong., 1st Sess. 349 (1977), *reprinted in* 1978 U.S. Cong. Code & Admin. News 5787, 6305 ("House Report"), § 365(g) itself promotes a substantive rule of bankruptcy law:

> ... the provisions of the subsection are not a substantive authorization to breach or reject an assumed contract. *Rather, they prescribe the rules for allowance of claims in case an assumed contract is breached....*

*Id.* Thus, while § 502(g) reaffirms § 365(g)(1) and "gives entities injured by rejection of an executory contract ... under section 365 ... a prepetition claim for any resulting damages," *Id.* at 354–55, U.S. Code Cong. & Admin.News 1978, at 6310, it does not negate or limit the rule of law established by § 365(g).

■ The same conclusion is required when considering the relationship between § 502(b)(1) and § 365(g). Section 502(b)(1) permits the Bankruptcy Court to disallow a claim to the extent that "such claim is unenforceable against the debtor and unenforceable against property of the debtor, under any agreement or applicable law other than because such claim is contingent or unmatured ..."; the legislative history states that the provision "requires disallow-ance if the claim is unenforceable against the debtor for any reason (such as usury, unconscionability, or failure of consideration) ..." House Report at 352, U.S. Code Cong. & Admin. News 1978, at 6308. Thus a court reviewing a § 365-based claim under § 502 may "contest the validity, amount or priority of the claim if necessary." *Arctic Enterprises, Inc. v. Tousley Sport Center (In re Arctic Enterprises, Inc.),* 15 B.R. 512, 513 (Bankr.D.Minn. 1981). Section 502 poses difficulties, however, when read so expansively that it places a party damaged by a § 365 breach of an executory contract—a breach affirmatively sought by the debtor—in the same position as any other prepetition claimant. This reading, urged by the Trustee, has the effect of excising the word "breach" from § 365(g).

Section 365(g) provides in pertinent part that "the rejection of an executory contract ... constitutes a breach of such contract...." Interpreting the meaning of "breach", this Court bears in mind the Supreme Court's frequent repetition of the preeminent rule of statutory construction: "If the statutory language is clear, it is ordinarily conclusive." *United States v. Clark,* 454 U.S. 555, 560, 102 S.Ct. 805, 809, 70 L.Ed.2d 768 (1982); *Consumer Product Safety Comm'n. v. GTE Sylvania, Inc.,* 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980); *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). The Trustee invokes the maxim that a statute should be construed to give effect to all of its parts, in this case §§ 502 and 541 as well as § 365. *Philbrook v. Glodgett,* 421 U.S. 707, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975). "This maxim does not, however, override the primary rule of statutory construction: a statute's plain meaning should be given priority in its construction." *Western Union Telegraph Co. v. F.C.C.,* 665 F.2d 1126, 1137 (D.C.Cir.1981) (footnote omitted). The priority to be given a particular word in a statute is especially clear when Congress chose to use the word "breach" in § 365(g) when it could have used "non-perform-

ance", as in § 365(h)(2)(i)(2)(A). To ignore the word "breach" by reading § 502 too broadly would thus violate another "elemental canon of construction that a statute should be interpreted so as not to render one part inoperative." *Colautti v. Franklin,* 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979); *United States v. Menashce,* 348 U.S. 528, 75 S.Ct. 513, 99 L.Ed. 615 (1955).

█ The Trustee's view emasculates § 365 by permitting a debtor to recognize the validity of an executory contract for purposes of rejecting it under § 365 without barring him from raising defenses wholly inconsistent with the § 365 finding that a contract existed and with the ordinary meaning of the term "breach". It is infinitely more sensible to hold that a breach is a breach—that once a debtor requests and receives a formal order of the Bankruptcy Court breaching a contract it may only challenge the resulting claim against the estate by raising those defenses which are not foreclosed by the judicial finding that the debtor failed to perform its obligations under the contract. Such a conclusion does not mean that § 365 creates an irrebutable presumption of a valid claim. Rather, it merely prevents a debtor from taking logically and legally inconsistent positions in order to deprive the other party to a valid contract of all rights deriving from that contract. By permitting the Trustee to raise defenses inconsistent with its prior finding that a valid contract was breached, the Bankruptcy Court skews the debtor-creditor balance of §§ 365 and 502 too far in the direction of the debtor, in violation of well-established principles of contract law.

**C.**

█ Determination of the meaning of "breach" in this case depends upon choice of law and substantive state contract law questions not yet resolved by the Bankruptcy Court. This Court agrees with the Trustee that the Bankruptcy Court, not the District Court, should resolve those questions in the first instance. *See In re White*

*Motor Corp.,* 42 B.R. 693 (N.D.Ohio 1984) (interpreting jurisdictional provisions of the Bankruptcy Amendments and Federal Judgeship Act of 1984). On remand, however, the Bankruptcy Court should stay discovery proceedings until it determines whether White's breach of the Mazirow contract entitles Mazirow to partial summary judgment on the issue of liability under the applicable state contract law.

The decisions of the Bankruptcy Court denying Mazirow's motion for partial summary judgment and motion for protective order and granting White's motion to compel discovery are vacated and the case is remanded to the Bankruptcy Court for further proceedings consistent with this opinion.

IT IS SO ORDERED.