**In re Ralph URBAN, Debtor.**

**Bankruptcy No. 91 B 15142 (PBA).**

United States Bankruptcy Court,
S.D. New York.

March 31, 1994.

Ralph Urban, New York City, Debtor, Pro Se.

Weiner & Millo by Alan S. Weiner, New York City, for William Hurley.

## MEMORANDUM DECISION GRANTING MOTION OF DEBTOR TO EXPUNGE CLAIM # 4 OF WILLIAM HURLEY

PRUDENCE BEATTY ABRAM, Bankruptcy Judge.

The debtor, Ralph Urban ("Urban" or "Debtor") has sought to have this court disallow a $15,000 claim filed by William Hurley ("Hurley"). Hurley's claim is based on Urban's rejection of an executory contract for the sale of certain real property.

The Debtor and Hurley have been engaged in litigation over a contract for the sale of certain farm land in Starkey, which is located in the Finger Lakes Region of Central New York, since 1988. Hurley's attempts to compel Urban to specifically perform the sale contract terminated when this court permitted rejection pursuant to the provisions of Bankruptcy Code § 365(g). Significant animosity exists between the Debtor and Hurley. Both testified at the hearing on the Debtor's objection to Hurley's claim.

For the reasons set forth below, the court grants the Debtor's motion to expunge the proof of claim filed by Hurley. The court's findings of fact and conclusions of law follow.

### Findings of Fact

Urban and Hurley first met in the Spring of 1988 after Hurley answered a newspaper advertisement placed by Urban which offered a farm for sale. At that time Urban owned 103 acres of land which he had purchased from Stanley and Beverly Olevnick (the "Olevnicks") in 1984. The Olevnicks held a mortgage on the property in the original principal amount of $30,000.

After two weeks of "negotiation", during which only Hurley was represented by counsel, the parties reached an agreement concerning the sale. Each party has described this period differently. The Debtor testified that it consisted of Hurley repeatedly yelling at him and pressuring him into selling Hurley the land and that he entered into the sales contract under duress. Hurley, on the

other hand, testified that the Debtor kept changing his mind, alternatively telling him that the land had been sold to a third party or that time was of the essence and that Hurley should bring the purchase money immediately if he really wanted to buy the property.

Urban explained at the trial that he felt constrained to enter into the contract of sale with Hurley because of the perceived authority Hurley yielded over him due to Hurley's criminal justice background. At that time Hurley was a senior parole officer with the state. The Debtor went on to state that while he did enter into the contract with Hurley, he felt that Hurley:

" * * * had a fundamental attitude about life and an approach towards specifically contracts that was totally incompatible with mine and I just knew that any contract with him would result in a litigation and that was the basic issue that was argued with [Hurley's attorney] for hours, that threats were made and that Mr. Hurley has had a short fuse and that I did not want litigation and that there was no sense in my getting involved in a contract that was obviously going to result in complications and any contract with Mr. Hurley would result in complications because of his mindset and because of just his personality, etc., and there was instantaneous personality clash when he first came over to my property."

Tr.[1] at pp. 197–198.

The parties executed a contract on March 3, 1988 ("the Contract of Sale") for the sale of 100 acres (the "Contract Land") of the 103 acres then owned by Urban and Hurley made a $17,500 down payment which was held by his attorney, Connie Fern Miller ("Miller"), in escrow pending closing. The agreed purchase price was $41,500 payable as $18,500 cash, with Hurley to assume the obligation for the balance due on the outstanding Olevnick mortgage. Urban, a horse trainer, was to retain a three acre parcel across the road from the Contract Land for his horses. A condition of the Contract of Sale required Hurley to arrange for the Olevnicks to release this three acre parcel from their mortgage. Upon signing the Contract of Sale, the Debtor terminated a prior contract to sell the land to a third party. The prior contract terminated without incident or litigation.

The Contract of Sale provided that title was to be conveyed in the form of a quit claim deed because Urban did not want to convey title in the form of a warranty deed as he believed that there were certain defects in the title he held which made the title uninsurable. These impediments, according to Urban, involved the legal right of a previous owner to transfer title to the Olevnicks in the form of a warranty deed since the previous owner had sold the land to the Olevnicks prior to ratifying ownership through the probate process.

The closing between Hurley and Urban scheduled for March 10, 1988 did not occur. There is considerable lack of clarity as to why the closing did not occur with Urban arguing that Hurley did not have the necessary money and that Hurley could not get the three acres released from the Olevnick mortgage. Since Urban and the Olevnicks were not on speaking terms it had been left to Hurley to negotiate the release of the three acres to be retained by the Debtor. Hurley's testimony was that he believed that the Olevnicks would execute the necessary documents to release the three acres. As to the monetary side, it appears that Hurley did place the downpayment in escrow with his attorney and that the attorney returned the deposit to Hurley.[2] Urban is of the view

---

**1.** Trial Transcript April 21, 1993, hereinafter "Tr. at p. ——".

**2.** On December 15, 1991, the Debtor commenced an adversary proceeding, No. 91–6570A, against eight defendants including Hurley and Connie Fern Miller regarding the Contract Land. The complaint alleges, *inter alia*, constitutional claims against Hurley, Haag–Tuttle, Yates County and the State of New York; a breach of fiduciary duty claim against Miller with respect to the return of the escrow monies to Hurley; and a breach of contract claim against the Olevnicks. All of the defendants filed timely responses to the complaint with the exception of Tuttle who has not appeared. The defendants in this adversary proceeding are Hurley, Miller, Haag, Tuttle, County of Yates, State of New York, and the Olevnicks.

that he was entitled to receive the downpayment as liquidated damages since he believed that Hurley could not complete the Contract of Sale. The propriety of the return of the escrow monies is not at issue on the objection to claim. The release of the downpayment to Hurley has caused suspicion on the part of Urban as to whether Hurley actually had the funds available to complete the transaction.

When the closing failed to occur and after Hurley had received his deposit back, Urban entered into a contract on May 20, 1988 to sell 73 acres of the land to Linda Haag and Gerald Tuttle ("Haag–Tuttle"). Urban was to retain a 30 acre parcel.

Three days later and on May 23, 1988, Hurley filed a *lis pendens* with the Clerk of Yates County against the land. Urban received notice of the *lis pendens* on May 26, 1988. Prior to receiving the *lis pendens*, Urban did not know that Hurley was still interested in the Contract Land since the downpayment had been returned and there had been no further communication between the parties. When he learned that Hurley was interested, Urban immediately sent a mailgram which read:

"Dear Mr. Hurley, I didn't know you were still interested in buying. A. bring me a certified check for $19,500 payable to me immediately. B. Bring me note and mortgage release you claim to have. 3. I don't own quitclaim title anymore. I have warranty title. We can discuss reasonable adjustment for the improved title. Will you bring items and time is of the essence. Get check first thing on Monday or Tuesday."

Tr. at 143. There is no indication that Hurley responded to the mailgram.

Throughout his testimony, Urban urged that the most important aspect of the contract negotiations was that time was of the essence because he was in immediate need of money. Hurley interpreted Urban's desire to move forward quickly with a suspicion that does not appear to have been warranted by the facts. Hurley testified that he viewed Urban as an " * * * unsophisticated con man, trying to cabbage downpayment[s] from * * * unsuspecting vulnerable people". Tr. at p. 229. Hurley received his own downpay-

ment back within days without difficulty. While Hurley made much at trial of the problems of Haag–Tuttle and the Olevnicks as a result of their dealings with the Debtor, the reality is, as more fully discussed below, that their problems were caused by Hurley's pursuit of his specific performance suit and the uncertainties it created.

The Haag–Tuttle contract was eventually revised and made subject to the *lis pendens* filed by Hurley. On June 29, 1988, a closing was held. Urban delivered title to the 73 acres by warranty deed as the cloud on the Olevnicks' title had by then been resolved. Haag–Tuttle assumed the Olevnick mortgage as part of the purchase price and Urban's 30 retained acres were released from the Olevnick mortgage. Eventually, Urban delivered an amended warranty deed which conveyed title to Haag and her three sons. The reason for this change is unknown to the court.

Subsequently, Hurley commenced an action to compel specific performance of the Contract of Sale in the New York State Supreme Court for Yates County (the "State Court Litigation"). After two years of litigation, Hurley and Urban entered into a stipulation on March 23, 1990 resolving the State Court Litigation (the "Stipulation"). The Stipulation, as embodied in an order and judgment, provided that the Contract of Sale would be specifically performed upon the same terms and conditions as the original contract with the exception that the purchase price would increase to $43,500. Under the Stipulation, Urban was to provide Hurley's attorney with certain documents, including an abstract, necessary to effectuate closing and the closing was to occur within ten days. However, Urban did not provide the necessary documentation and no closing occurred within the specified period of time. Hurley testified before this court that he filed the *lis pendens* and continued to press for the enforcement of the Contract of Sale because, as he testified:

"We are a nation of laws. I am a criminal justice professional. I really don't think people like Mr. Urban should be allowed to do this kind of thing."

Tr. at p. 209.

At the time of the execution of Stipulation, Hurley knew that Urban had closed under

the Haag–Tuttle contract. Haag–Tuttle apparently were not parties in the State Court Litigation. Haag had sued Urban in a separate action and obtained a monetary judgment against Urban in an amount equal to the downpayment. However, the judgment does not contain any language divesting Haag–Tuttle and/or Haag of title to the 73 acres or relieve them of the responsibility for the Olevnick mortgage.

Several months after a closing under the Stipulation failed to occur, Hurley moved by order to show cause in the State Court to compel Urban to perform the contract pursuant to the Stipulation. By Memorandum Decision dated July 3, 1991, Judge Marks directed Urban to appear, perform and take part in a closing on July 22, 1991 at 9:00 a.m. and if Urban failed to appear, the Sheriff was directed to immediately execute the deed on Urban's behalf. Urban did not appear at the closing on July 22, 1991, and Hurley did not immediately seek the assistance of the Sheriff to consummate the transaction. At trial, Hurley offered no explanation for his failure to obtain a Sheriff's deed.

On July 24, 1991, Urban filed a Chapter 7 petition in Delaware, therefore invoking the automatic stay under Code § 362. That case was eventually dismissed. The present case, Urban's third, was filed as a Chapter 11 case on November 13, 1991, after the intervening Chapter 13 case had been dismissed.

During the Chapter 11 case and in early March 1992, Urban filed a motion under Code § 365(g) to reject his obligation to convey the land to Hurley (the "Rejection Motion"). The Rejection Motion was heard and granted by this court on April 9, 1992. Hurley had personal knowledge of the Rejection Motion but elected not to appear before this court on the return date or file a timely written response.

Between the time this court granted the Rejection Motion but prior to the signing of an order to that effect, Hurley sought to enforce the Stipulation and obtained an order from the State Court directing the Sheriff of Yates County to execute a deed for the Contract Land in favor of Hurley. Hurley had not sought to lift the automatic stay prior to proceeding in the State Court. On Urban's

application, on May 29, 1992, this court enjoined Hurley from taking any further action in the State Court Litigation.

On June 26, 1992, after retaining local counsel, Hurley filed a motion to reargue the Rejection Motion. After argument and briefing, this court signed an Order on August 24, 1992, granting the Rejection Motion and denying Hurley's Motion for Reargument. The order directed Hurley to file any proof of claim damages resulting from the rejection within sixty days.

Hurley filed a proof of claim in the amount of $15,000 on October 19, 1992 ("Proof of Claim"). Subsequently, and in response to Urban's demand for a more particular statement of the damages alleged, Hurley delineated his damages as follows:

a. Loss of Bargain        $12,000

b. Consequential Damages
 1. Travel Expenses over past 4 years to and from property      300
 2. Legal Fees incurred in contracting to purchase property      2,000
 3. Expenses Incurred in maintaining the property      700

Damages for loss of bargain were calculated by Hurley as the difference between the current fair market value of the Contract Land, which he claimed was $55,500, and the contract price of $43,500 provided in the Stipulation. Hurley based the current fair market value used in the Proof of Claim on a consultation with a real estate agent. Tr. at p. 243. On October 30, 1992, Urban filed a motion to disallow or expunge Hurley's Proof of Claim.

The testimony at trial principally concerned the value of the Contract Land. Prior to the trial Hurley submitted a written appraisal of the Contract Land. However, no weight can be ascribed to that appraisal as this court declined to admit the appraisal into evidence at the trial as the appraiser was not present at the trial.

Hurley was permitted at the trial to offer his personal opinion as to the value of the Contract Land. He is not a realtor or expert in real estate valuation. Hurley stated that

the Contract Land must be worth at least as much as he agreed to pay for it or he would not have entered into the Contract of Sale or sought its enforcement during the succeeding five years. He offered valuations ranging from $60,000 to $100,000. Hurley's conclusions about the value of the Contract Land were based on his views of what a number of other properties with similar acreage had sold for in the area. He did not know whether these other sales were raw land values or if they included improvements. The difference between a quit claim deed and a warranty deed was not a factor in Hurley's value conclusions.

At the trial, Urban offered the testimony of an expert witness on the issue of valuation. The witness, Chris Wickey ("Wickey"), appraised the Contract Land at $37,537. Wickey, a real estate agent and former building contractor, based his valuation on comparable sales for the prior twelve months as contained in the Elmira/Corning Regional Board of Realtors Multiple Listing Book with adjustments made for the quit claim deed and limited road access.

Wickey possessed first-hand knowledge of market conditions from his experience as a real estate agent and contractor. Prior to formulating a valuation, Wickey personally inspected the Contract Land. Wickey testified that based on five comparative sales over the past twelve months in the surrounding area he placed an initial value of $512.21 per acre or $51,221 for the Contract Property. Only larger properties were considered because smaller acreage generally sells for more per acre and Wickey did not consider these sales comparable. He testified that the Contract Land has no special aesthetic appeal and is rather ordinary.

In his evaluation of the Contract Property, Wickey testified that a reduction in value was appropriate because the property does not have good road access as there is very narrow road frontage that crosses a large ditch. The property was described as being close to landlocked with a very narrow neck leading to the road. Wickey reduced his valuation by $6,000 to account for this negative attribute. He believed that this would be the appropriate amount to use to obtain an additional right of way from neighboring land owners or to construct a better crossing over the roadside ditch.

Wickey was of the opinion that the delivery of a quit claim deed would be worth less than or cause a discount in value from, the delivery of a warranty deed for the same property. Wickey identified a quit claim deed as one that did not contain covenants, warranties or any implication of ownership. Wickey testified that he reduced the value in his appraisal by 15 percent to take into account that the sale was by a quit claim deed. Wickey also testified that a larger reduction, up to 50% of value, would not be unusual since there is great risk and uncertainty associated with a quit claim deed. Further, Wickey stated that in his opinion the purchaser must really want the property to assume the risk associated with a quit claim deed.

Wickey testified that the structures on the land, including a house, barn and silo, did not have any intrinsic value and that his valuation of the property was essentially a raw land valuation. Hurley, during his testimony, conceded that the value of the buildings was minimal at best.

The court finds that there was an impediment to title and that a discount must be applied to the valuation to account for the fact that the conveyance was to be by way of a quit claim deed. At a minimum Hurley would have been required to bear the expense of clearing title.

The court finds that the value of the Contract Land was $42,126.43 on the date immediately preceding the date this case was commenced. This value conclusion accepts an initial valuation of $55,560.50 for the Contract Land, the mid-point between the valuation of Wickey and the low valuation of $60,000 offered by Hurley. It is also the unadjusted value conclusion offered by Hurley in his proof of claim as the fair market value of the Contract Land. This amount is further reduced by $6,000 to account for the limited road frontage and an additional 15% or $7,434.07, to account for the quit claim deed. The court has reached this value conclusion based upon the testimony of the parties and

the comparable sales figures offered by Wickey which the court believes are the best basis for determining value.[3]

Hurley stated as to his claim for legal fees as follows: that he incurred $4,889.50 in legal fees to Raymond Urbanski, Esq., in connection with his efforts to compel Urban to comply with the Contract of Sale. No invoices or bills or canceled checks were offered at trial. He did not include in his claim any legal fees for Miller in connection with her representation of him during the negotiations leading to the original Contract of Sale.

Hurley testified as to other expenses he alleges he incurred. A substantial amount of the expenses were not included in his proof of claim. For example, Hurley testified that he paid $6,000 to the Olevnicks on their mortgage because they were financially insecure people who were destroyed by the turn of events. At one point Hurley went upon the Contract Land and changed the locks to secure the buildings and on another occasion he arranged for the land to be cleared of debris to remedy a fire hazard. Hurley even obtained and maintained fire insurance for the Contract Property for a few years and he arranged to have the power turned on.

Hurley undertook a cleanup of the land to remedy what he described as a fire hazard in the summer of 1989. Hurley hired boys from the neighboring land to assist in removing five truckloads of trash and debris. Hurley alleges that he paid the trucking company $367 and the boys $250 or $617 in total. Hurley did not present receipts for this expenditure to the court.

In connection with his claimed transportation costs, Hurley estimates that he was back and forth to the property numerous times and that at a minimum he expended $300 in cash expenses such as gasoline. Receipts were not offered for this expense.

### Discussion

■ Under Code § 365(a) a debtor, subject to court approval, may assume or reject any executory contract. However, a court cannot authorize assumption or rejection of

an executory contract if there is no contract. *In re Sanshoe Worldwide Corp.*, 993 F.2d 300, 305 (2d Cir.1992). Issues relative to the validity of the contract are foreclosed on a rejection motion since a motion to reject

> " * * * should be considered a summary proceeding, intended to efficiently review the trustee's or debtor's decision to adhere to or reject a particular contract in the course of the swift administration of the bankruptcy estate."

*In re Orion Pictures, Corp.*, 4 F.3d 1095, 1098 (2d Cir.1993), petition for cert. dismissed, —— U.S. ——, 114 S.Ct. 1418, 128 L.Ed.2d 88 (January 31, 1994) (No. 93–1231).

Thus, this court need not consider the Debtor's arguments that the Sale Contract and/or the Stipulation were not enforceable.

■ Under Code § 365(g) the rejection of an executory contract constitutes a breach of the contract immediately before the date of the filing of the petition. Neither Code § 365(g) or any other provision of the Code gives rise, as a matter of law, to an irrebuttable presumption that any claim for damages flowing from the rejection is allowable. *In re White Motor*, 44 B.R. 563, 570 (N.D.OH 1984); *In re Hooker Investments, Inc.*, 131 B.R. 922, 928 (Bankr.S.D.N.Y.1991). However, a debtor is precluded from recognizing the validity of a contract for the purposes of rejecting it and then raising defenses to a claim for damages that are wholly inconsistent with the required finding that a contract existed. *In re White Motors*, 44 B.R. at 570.

■ The appropriate measure of damages for rejection of an executory contract is determined with reference to state law. In New York, damages for the breach of a contract for the purchase of real property are measured as the difference between the contract price and the market value at the time of the breach, or "loss of bargain" damages, together with other expenses necessarily incurred in reliance on the contract. *In re Kent*, 91 B.R. 1, 3 (Bankr.E.D.N.Y.1988); *In re RLR Celestial Homes, Inc.*, 108 B.R. 36, 46 (Bankr.S.D.N.Y.1989); *Colonial Diversified v. Assured Holding Corp.*, 71 A.D.2d

---

**3.** Under appraisal theory, the effort is to determine what a willing buyer would pay a willing seller given an adequate exposure to the market and sufficient time for marketing.

1011, 420 N.Y.S.2d 419 (2d Dept.1979); *Bailey v. Morgan,* 95 A.D.2d 883, 463 N.Y.S.2d 882 (3d Dept.1983), *aff'd.* 62 N.Y.2d 844, 477 N.Y.S.2d 624, 466 N.E.2d 164 (1984); *Lotito v. Mazzeo,* 132 A.D.2d 650, 518 N.Y.S.2d 22, 23 (2d Dept.1987); *Freidus v. Eisenberg,* 510 N.Y.S.2d 139, 142, 123 A.D.2d 174 (2d Dept. 1986), *dismissal denied,* 517 N.Y.2d 936, 69 N.Y.2d 1016, 511 N.E.2d 79, *aff'd. as mod.* 529 N.Y.S.2d 69, 71 N.Y.2d 981, 524 N.E.2d 423; 91 N.Y.Jur.2d *Real Property Sales & Exchanges* §§ 184, 185.

As this court has found that the market value of the Contract Land was less at the time of the breach than the contract price, Hurley has no allowable loss of bargain damages.

The acreage Urban was required to convey under the Stipulation was subject to a dispute at trial. Urban believed that the Stipulation modified his obligation to Hurley in that he was only required to convey 30 acres to Hurley rather than the 100 acres originally contemplated under the Contract of Sale. Hurley, on the other hand believed that the Stipulation required Urban to convey 100 acres to him and the only material change from the Contract of Sale was the increased purchase price. This Court concludes, after hearing the testimony of the parties, reviewing the Contract of Sale and the Stipulation, that Urban rejected an executory contract requiring him to convey 100 acres of real property to Hurley.[4]

■ Hurley has also asserted a claim for certain expenses he alleges he incurred. Three categories of expenses have been asserted: travel costs, legal fees and maintenance costs. For these to be part of a damage award, the costs must have been incurred in reliance on, or in furtherance of, the contract. However, the claimed expenses for travel and maintenance are more consistent with someone who has an ownership interest and therefore has responsibility for the maintenance and upkeep of the property than with someone who is merely a contract vendee. Although he had a judg-

ment for specific performance, Hurley did not have any legal or financial responsibility for the Contract Land. Hurley undertook the cleanup without the auspices of title or entitlement. These damages do not naturally flow from the Contract of Sale nor were they incurred in reliance on the Contract of Sale. With respect to travel expenses, no more than nominal gasoline expenses could have been incurred in reliance on the Contract of Sale. The expenses Hurley alleges he incurred in connection with the removal of debris and the travel expenses were not incurred in furtherance of the underlying executory contract and are not allowable.

■ The final element of expenses claimed by Hurley is attorneys' fees. Attorneys' fees are ordinarily a proper element of a damage claim for breach of a purchase and sale agreement. *In re Kent,* 91 B.R. at 3; *In re RLR Celestial Homes, Inc.,* 108 B.R. at 46. This court disallows this portion of Hurley's proof of claim because of a failure of proof at the trial.

The $2,000 number used in the proof of claim was shown by Hurley's trial testimony to have no basis in fact. No invoices or checks were introduced at trial to support Hurley's trial testimony with respect to his actual legal expenses which were alleged as substantially higher. Hurley's testimony was vague and unconvincing. It did not provide any basis for this court to make the necessary finding that any legal expenses were reasonable in amount and for appropriate services. *Compare In re Nicfur–Cruz Realty Corp.,* 50 B.R. 162 (Bankr.S.D.N.Y. 1985).

### Conclusion

For the foregoing reasons, this court grants Urban's motion to expunge Hurley's Proof of Claim.

A separate order has been signed.

---

4. The practical result of permitting Urban to reject the Contract of Sale as embodied in the Stipulation was to remove the technical problems associated with Urban not owning the land he was required to convey since Hurley's sole recourse was converted into a claim for money damages.