In re CARDINAL INDUSTRIES, INC. et al., substantively consolidated with and jointly administered with

Cardinal Industries Mortgage Company, Debtors.

The HUNTINGTON NATIONAL BANK COMPANY, Plaintiff,

v.

Jay ALIX, as Trustee for Cardinal Industries Mortgage Company,

and

Ameritrust Company National Association, Defendants.

Bankruptcy No. 2–89–02779.
Adv. No. 2–90–0308.

United States Bankruptcy Court, S.D. Ohio, E.D.

May 18, 1992.

Jack R. Pigman, Porter, Wright, Morris & Arthur, Columbus, Ohio, for plaintiff The Huntington Nat. Bank.

Alec Wightman, Baker & Hostetler, Columbus, Ohio, for defendant Ameritrust Co. Nat. Ass'n.

Michael L. Cook, Sally M. Henry, Skadden, Arps, Slate, Meagher & Flom, New York City, Co–Counsel to defendant Jay Alix as Trustee for Cardinal Industries Mortg. Co.

Marilyn Shea–Stonum, Jones, Day, Reavis & Pogue, Columbus, Ohio, Co–Counsel to defendant Jay Alix as Trustee for Cardinal Industries Mortg. Co.

Jay Alix, Trustee, Jay Alix & Associates, Southfield, Mich.

Charles M. Caldwell, Asst. U.S. Trustee, Columbus, Ohio, Columbus Office of the U.S. Trustee for Region IX.

James H. Bownas, Cardinal Industries, Inc., Columbus, Ohio.

Charles J. Taunt, Charles J. Taunt & Associates, Birmingham, Mich., Special Counsel to the Trustee of the Consolidated Estate.

Gary Cunningham, Kramer Mellen, P.C. Southfield, Mich., Special Counsel to the Trustee of the Consolidated Estate.

Leon Friedberg, Benesch, Friedlander, Coplan & Aronoff, Columbus, Ohio, for the Official Committee of Unsecured Creditors.

## OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT

BARBARA J. SELLERS, Bankruptcy Judge.

This matter is before this Court upon the motion of plaintiff The Huntington National Bank ("Huntington") for summary judgment on Count I of its complaint for declaratory relief against defendant Cardinal Industries Mortgage Company ("CIMC"). Huntington moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, made applicable to bankruptcy proceedings by Bankruptcy Rule 7056. Huntington seeks a declaration from this Court that an agreement extending a line of credit from Huntington to CIMC is an executory contract that cannot be assumed by the Chapter 11 Trustee of CIMC consistent with 11 U.S.C. § 365(c)(2).

Defendant Ameritrust Company National Association ("Ameritrust") opposes Huntington's motion for summary judgment and has filed a cross motion for summary judgment. Ameritrust contends that Huntington's agreement to extend a line of credit to CIMC is not an executory contract and thus is not a contract for the financial accommodation of CIMC subject to § 365(c)(2). Alternatively, Ameritrust contends that, whether or not the loan commitment is an executory contract, the agreement can still be enforced by Ameritrust in its role as trustee for the intended third-party beneficiaries of the credit line, certain holders of mortgage certificates. The Trustee of CIMC does not intend to assume the credit agreement and, therefore, does not dispute Huntington's assertions. Both Huntington and Ameritrust posit that only issues of law remain for decision, thereby making summary judgment appropriate.

The court has jurisdiction in this adversary proceeding pursuant to 28 U.S.C. § 1334(b), § 2201(a), and the General Order of Reference previously entered in this district. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (D) which this bankruptcy judge may hear and determine.

### I. Facts

The relevant facts are undisputed and are as follows:

CIMC is a subsidiary of Cardinal Industries, Inc. ("Cardinal"). Cardinal is the general partner in many limited partnerships which own and operate apartment properties.[1] Cardinal organized CIMC to

---

1. This case has been substantively consolidated with the Chapter 11 bankruptcy proceedings of Cardinal Industries, Inc. For an extensive history of Cardinal's business operations set forth in earlier opinions of this Court see *Cardinal Industries, Inc. v. Buckeye Federal Savings & Loan Assoc. (In re Cardinal Industries, Inc.)*, 102 B.R. 991; 105 B.R. 834 (Bankr.S.D.Ohio 1989); *In re Cardinal Industries, Inc.*, 109 B.R. 755 (Bankr.S.D.Ohio 1990).

provide mortgage financing and servicing in connection with the property developments of Cardinal. In December 1987, CIMC extended mortgage loans to ten limited partnerships in which Cardinal was general partner. CIMC secured each mortgage loan with a first mortgage on the rental properties of each limited partnership. To effectuate the financing of these mortgage loans, CIMC entered into two separate, but interrelated, agreements: The Pooling and Servicing Agreement and the Credit Agreement.

On December 1, 1987, CIMC and Ameritrust executed the Pooling and Servicing Agreement under which CIMC pooled the ten mortgage loans and issued commercial mortgage pass-through certificates ("Certificates"). The Certificates issued by CIMC represented undivided interests in the pooled mortgage loans. As part of the Pooling and Servicing Agreement, CIMC assigned its interest in the pooled mortgage loans to Ameritrust to act as tender agent and as trustee for the Certificateholders. Under the agreement, CIMC was required, among other things, to service the mortgage loans and to repurchase any tendered Class A Certificates which could not be remarketed.

On December 29, 1987, CIMC and Huntington executed the Credit Agreement. The Credit Agreement was designed to provide funding for the repurchase of tendered Certificates not yet remarketed under the Pooling and Servicing Agreement. Under the Credit Agreement, Huntington contracted to provide a revolving line of credit to CIMC in an amount not to exceed $15,106,500.00. Funds for the repurchase of the Certificates were to be requisitioned and disbursed according to procedures set forth in the Credit Agreement. Certificates repurchased under the Pooling and Servicing Agreement became the property of CIMC with Huntington having a first lien and security interest in all such Certificates. Disbursements under the Credit Agreement were to be deposited directly into the tender agent account of Ameri-

trust and were to be made on behalf, and for the account, of CIMC. The Credit Agreement required CIMC to cause Ameritrust to deliver the Certificates not remarketed to Huntington within three business days of the request for disbursement, registered in the name of the Huntington as pledgee. Huntington would retain possession of the Certificates until either it received the proceeds from the Certificates' remarketing or CIMC repaid Huntington. The Credit Agreement also required CIMC to pay annual commitment fees to Huntington in consideration for the line of credit.[2]

The Credit Agreement was scheduled to terminate on December 10, 1990. All requisitions for funds were to occur before this date. In addition to the commitment termination date, the Credit Agreement contained a number of provisions describing events that would terminate Huntington's line of credit to CIMC at an earlier date. The final termination provision in subsection 8(a)(iv) of the Credit Agreement states that the Agreement would terminate on the date of the last permitted requisition following an "event of default." An "event of default" is defined in the Credit Agreement as including, among other things, the filing of voluntary bankruptcy by CIMC and the failure to pay the annual commitment fee. Upon the occurrence of an event of default, Huntington had the choice of exercising an option to terminate the Credit Agreement earlier than the commitment termination date by giving notice of its intention to terminate and by allowing the tender agent (Ameritrust) and the remarketing agent to establish a liquidity tender date for the repurchase of Certificates. Following the liquidity tender date, Ameritrust could make a final requisition of funds from Huntington. Huntington would then make a final disbursement, and thereafter the Credit Agreement would terminate.

On March 29, 1990, CIMC filed for Chapter 11 bankruptcy. Huntington failed to give notice at this time, or any time there-

---

**2.** The annual commitment fee was three-quarters of one percent (.75%) per annum of the daily average unused balance of the line of credit. This fee was paid quarterly in arrears with the last payment falling on the commitment termination date.

after, of its intention to terminate the Credit Agreement earlier than the commitment termination date. Prior to the commitment termination date, the Certificateholders tendered their Certificates to Ameritrust in accordance with the Pooling and Servicing Agreement and the Credit Agreement. It is uncontested that Ameritrust and the remarketing agent complied with the procedures specified in the Pooling and Servicing Agreement and the Credit Agreement. On November 29, 1990, Ameritrust gave Huntington a requisition of the funds required to repurchase the Certificates and a request for disbursement. Pursuant to the Credit Agreement, Huntington was obligated to disburse the requested funds on December 3, 1990. Huntington failed to disburse the funds. Thereafter, Huntington filed a complaint for declaratory relief and a motion for summary judgment in the Chapter 11 bankruptcy case of CIMC, naming Ameritrust, among others, as a defendant. Ameritrust opposed Huntington's motion and filed a cross motion for summary judgment.

## II. *Legal Arguments*

Huntington seeks a declaration from this Court that the Credit Agreement with CIMC is an executory contract for the financial accommodation of CIMC and, as such, cannot be assumed by the Chapter 11 Trustee. Huntington contends that the elements necessary to preclude assumption of a contract under 11 U.S.C. § 365(c)(2) are present. Huntington argues that the Credit Agreement is (i) an executory contract; (ii) "to make a loan, or extend other debt financing, or financial accommodations;" that is (iii) "to or for the benefit of" CIMC.

Ameritrust asserts that, as Tender Agent and Trustee of the Certificateholders, it is entitled to enforce the third-party beneficiary rights of the Certificateholders contemplated by the Credit Agreement. Ameritrust contends that § 365(c)(2) is inapplicable because the Credit Agreement is not an executory contract. Ameritrust argues that the Credit Agreement does not satisfy the definition of an executory contract because, under the terms of the Agreement, CIMC's failure to perform as a result of its bankruptcy or its breach of the Credit Agreement does not excuse Huntington's performance. Thus, Ameritrust contends that the Credit Agreement is not an executory contract under 11 U.S.C. § 365(a), notwithstanding the fact that performance obligations remain for both CIMC and Huntington. As a result, Ameritrust contends that § 365(c)(2) is inapplicable.

In the alternative, Ameritrust argues that Huntington should not be excused from its obligations under the Credit Agreement even if this Court were to deem the Agreement to be executory. Ameritrust asserts that § 365(c)(2) only protects an "involuntary" creditor from being required to finance a debtor-in-possession's reorganization effort. In the case at bar, Huntington "voluntarily" agreed to make a final disbursement to CIMC in the event of bankruptcy. Ameritrust states that no inequity would result from requiring Huntington to perform what it had explicitly contracted to perform. Moreover, Ameritrust asserts that enforcing the rights of the Certificateholders against Huntington will not require the Trustee to assume the Credit Agreement. Ameritrust contends that Huntington negotiated to accept the risk of being required to make a postpetition disbursement of funds and of, in effect, taking the place of the Certificateholders as a creditor of CIMC's estate. Consequently, Huntington has waived any right to assert that the bankruptcy of CIMC excuses it from performance.

## III. *Issues of Law*

In considering Huntington's complaint for declaratory relief and the cross-motions for summary judgment of Huntington and Ameritrust, three legal issues are presented to this Court:

(1) Whether the Credit Agreement is an executory contract under § 365(a);

(2) If it is executory, whether the Credit Agreement is unassumable by CIMC's estate under § 365(c)(2); and

(3) Whether the protections of § 365(c)(2) can be waived by the Huntington's prepetition contractual agreement to

make a postpetition disbursement of funds to CIMC.

## IV. *Discussion*

As a preliminary matter, this Court will set forth the standard for summary judgment in a bankruptcy court. Rule 56 of the Federal Rules of Civil Procedure, made applicable to these proceedings by Bankruptcy Rule 7056, governs the application of summary judgment in bankruptcy proceedings. Rule 56(a) allows a party seeking declaratory relief to move for summary judgment. Rule 56(c) provides that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions· on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The essence of the standard for summary judgment is to reserve for trial only those disputes where there exists a *genuine* issue of material fact. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. at 2510. In considering the cross motions for summary judgment, this Court's examination of the pleadings does not reveal any genuine issue of material fact. Thus, this Court may proceed to determine whether Huntington or Ameritrust is entitled to judgment as a matter of law on the issues raised in Huntington's complaint for declaratory relief.

### A. Whether the Credit Agreement is an Executory Contract

 In the first issue before this Court, Huntington contends that the Credit Agreement is an executory contract under § 365(a) of the Bankruptcy Code, and Ameritrust contends that it is not. The resolution of this deceptively simple issue requires this Court to venture into the "thicket" of executory contracts in bankruptcy law. *See Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),* 138 B.R. 687 (Bankr.S.D.N.Y.1992). Courts have had a great deal of difficulty in developing a workable and coherent definition of what constitutes an executory contract for purposes of the rejection or assumption of contracts in bankruptcy. This difficulty has given rise to a number of different approaches set forth by courts to define executory contracts in the bankruptcy context. Consequently, a review of the case law reveals some confusion about this concept. As one commentator aptly describes, the law of executory contracts in bankruptcy has become "a hopelessly convoluted and contradictory jurisprudence." *See* Andrew, *Executory Contracts Revisited: A Reply to Professor Westbrook,* 62 U.Colo. L.Rev. 1, 1 (1991).

To understand the source of this confusion, an examination of § 365(a) provides that the trustee may assume or reject any *executory contract* of the debtor.[3] This provision has caused considerable confusion in the courts because neither § 365(a) nor any other section of the Bankruptcy Code specifically defines the phrase *executory contract.* The legislative history of § 365 indicates that the failure of Congress to define the phrase with any specificity was intentional, based on its belief that the general meaning of executory contract was well understood, and any more specific language risked an unintended omission or inclusion. *In re Sun City Investments, Inc.,* 89 B.R. 245 (Bankr.M.D.Fla.1988) [citing H.R. Doc. No. 137, 93rd Cong., 1st Sess. 199 (Part I) (1973) (Report of Commission on Bankruptcy Laws)].

The faith of Congress in a generally understood meaning of executory contract does not appear to be well-founded.

---

**3.** 11 U.S.C. § 365(a) provides in relevant part:
Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

Courts and commentators have noted that the phrase *executory contract,* by itself, is essentially meaningless because "once a contract ceases being executory, for all practical purposes, it ceases to exist." *Chattanooga Memorial Park v. Still (In re Jolly),* 574 F.2d 349, 350 (6th Cir.), *cert. denied,* 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978). As a result, courts have attempted to construct a workable definition of executory contracts in bankruptcy which reflects the purposes of § 365. Thus, the current judicial confusion over the meaning of executory contracts is largely attributable to the attempt by courts to define a phrase that Congress has refused to define, other than to indicate in the legislative history that it "generally includes contracts on which performance remains due to some extent on both sides." H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977); S.Rep. No. 989, 95th Cong., 2nd Sess. 58 (1978), U.S. Code Cong. & Admin.News 1978, pp. 5787, 5844, 6303.[4]

Many courts have found that Congress' broad statement does not, in itself, furnish a workable definition of executory contracts. The difficulty that courts have had with this definition stems from the fact that, taken literally, it is evident that almost all contracts could be considered executory. *In re Bluman,* 125 B.R. 359, 361–2 (Bankr.E.D.N.Y.1991) [citing *In re Leibinger–Roberts, Inc.,* 105 B.R. 208, 211 (Bankr.E.D.N.Y.1989)]. It is only the rare agreement that does not involve unperformed obligations on either side. *Mitchell v. Streets (In re Streets & Beard Farm Partnership),* 882 F.2d 233, 235 (7th Cir.1989). Consequently, the definition suggested in

the legislative history of § 365 has not effectively diminished the confusion of the courts concerning the meaning of executory contracts in bankruptcy.

When a body of case law becomes conceptually confused, it is helpful to return to the underlying purposes and principles that originally shaped the law. Courts have found that the general purposes of the Bankruptcy Code's provisions for the assumption or rejection of executory contracts under § 365 of the Bankruptcy Code include: (i) taking advantage of contracts which will benefit the estate; (ii) relieving the estate of burdensome contracts; (iii) promoting the debtor's fresh start; (iv) permitting the allowance and determination of claims; and (v) preventing parties from remaining "in doubt concerning their status vis-a-vis the estate." *In re Monument Record Corp.,* 61 B.R. 866, 868 (Bankr. M.D.Tenn.1986) [citing *Jolly,* 574 F.2d 349, 351; *In re Norquist,* 43 B.R. 224, 225 (Bankr.E.D.Wash.1984); H.R.Rep. 595, 95th Cong., 1st Sess. 348 (1977), *reprinted* in 1978 U.S.Code Cong. & Admin.News at 6304]. As a threshold matter, it is clear that any judicial attempt to define executory contracts in bankruptcy should encompass these basic purposes of § 365.

A notable judicial attempt to bring clarity to this area of bankruptcy law is the approach based on the pre-statutory definition of executory contracts originated by Professor Vern Countryman of Harvard, a draftsman of the Code and a well-known bankruptcy commentator. The Countryman definition has been widely, but not universally, adopted by courts.[5] The Coun-

---

**4.** *See also N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 522 n. 6, 104 S.Ct. 1188, 1194 n. 6, 79 L.Ed.2d 482 (1984) ["The Bankruptcy Code furnishes no express definition of an executory contract ... but the legislative history of Sec. 365(a) indicates that Congress intended the term to mean a contract 'on which performance remains due to some extent on both sides.'" (citation omitted)].

**5.** For bankruptcy courts in the Sixth Circuit adopting the Countryman definition see *The Monarch Tool & Mfg. Co. v. Monarch Product Sales Corp. (In re Monarch Tool & Mfg.),* 114 B.R. 134, 136 (Bankr.S.D.Ohio 1990); *Matter of Executive Technology Data Systems,* 79 B.R. 276,

280–81 n. 5 (Bankr.E.D.Mich.1987); *In re Pesce Baking Co. Inc.,* 43 B.R. 949, 957 (Bankr. N.D.Ohio 1984); *In re Fashion Two Twenty, Inc.,* 16 B.R. 784, 786 (Bankr.N.D.Ohio 1982). For other circuits adopting this definition see *Streets,* 882 F.2d at 235; *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.,* 872 F.2d 36, 39 (3rd Cir.1989) ("courts have generally relied on" the Countryman definition); *Speck v. The First National Bank of Sioux Falls (In re Speck),* 798 F.2d 279 (8th Cir.1986); *Draper v. Draper,* 790 F.2d 52, 54 (8th Cir.1986); *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.),* 756 F.2d 1043 (4th Cir.1985), *cert. den.,* 475 U.S.

tryman definition describes an executory contract as one "under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Countryman, *Executory Contracts in Bankruptcy: Part I;* 57 Minn.L.Rev. 439, 460 (1973). The Countryman definition, sometimes referred to as the "Material Breach Test," is viewed by the courts adopting this approach as offering a more narrow, and more workable, definition of executory contracts than the definition suggested in the legislative history of § 365. *See In re Structurlite Plastics Corp.,* 86 B.R. 922, 926 (Bankr.S.D.Ohio 1988). This definition attempts to effect the purposes of § 365 by focusing on the remaining "material" obligations of the parties. The Countryman definition seeks to ensure that the trustee's right to assume or reject is "an option to be exercised when it will benefit the estate," and that the right does "not extend to situations where the only effect of its exercise would be to prejudice other creditors of the estate." *Drexel Burnham,* 138 B.R. 687 [citing Countryman, *supra,* 57 Minn.L.Rev. at 450–51].

The Court of Appeals for the Sixth Circuit apparently adopted the Countryman definition in *Terrell v. Albaugh (In re Terrell),* 892 F.2d 469, 471 n. 2 (6th Cir.1989). In adopting this definition, the Sixth Circuit in *Terrell* initially cited the broader definition of executory contract set forth in the legislative history of § 365. Relying on the legislative history, the Sixth Circuit defined an executory contract as an agreement "on which performance remains due to some extent on both sides." *Terrell,* 892 F.2d at 471 [citing H.Rep. No. 595, 95th Cong. 1st Sess. 347 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 58 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5844, 6303].

However, in applying this definition, the Sixth Circuit noted that Congress "apparently had in mind the definition of executory contracts set forth in Countryman." *Terrell,* 892 F.2d at 471 n. 2 [citations omitted]. As a result, the Court proceeded to incorporate the Countryman definition into the definition of executory contracts suggested in the legislative history in addressing the facts of *Terrell.*

Thus, to determine whether a contract is executory in the bankruptcy context, the Sixth Circuit stated that a bankruptcy court must first look to the contract law of the state to determine if performance remains due to some extent on both sides of the contract. *Terrell,* 892 F.2d at 471. The court stated that a bankruptcy court must then decide whether the failure of one of the parties to perform their remaining obligations would give rise to a "material breach" excusing performance by the other party under the contract law applicable to the contract. *Terrell,* 892 F.2d at 472 [citing *Hall v. Perry (In re Cochise College Park, Inc.),* 703 F.2d 1339, 1348 n. 4 (9th Cir.1983); *Streets,* 882 F.2d at 235]. If the failure of either of the parties to perform the remaining obligations of the contract would give rise to a material breach, the contract is deemed executory. If the remaining obligations are not material or are not due to some extent on both sides, the contract is not deemed executory.

The Court of Appeals for the Sixth Circuit has also set forth a different and novel approach to defining executory contracts. In an earlier attempt to bring clarity to the meaning of executory contracts in bankruptcy, the Sixth Circuit articulated what may be characterized as a "functional" approach to defining executory contracts.[6] *See Jolly,* 574 F.2d 349. Acknowledging that the Countryman definition was frequently used by courts, the Sixth Circuit in

1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); *Gloria Manufacturing Corp. v. International Ladies' Garment Workers' Union,* 734 F.2d 1020, 1021 (4th Cir.1984) (Countryman definition "uniformly followed by courts"); *Fenix Cattle Co. v. Silver (In re Select–A–Seat Corp.),* 625 F.2d 290, 292 (9th Cir.1980).

6. *In re Jolly* was decided under an earlier version of the Bankruptcy Code, the Bankruptcy Act of 1898.

*Jolly* stated that, although helpful, the Countryman definition does not resolve all the difficulties that courts face in defining executory contracts. *Jolly*, 574 F.2d at 351. While noting that executory contracts are "[g]enerally agreements which include an obligation for the debtor to do something in the future," the court then proceeded to employ a functional approach in which it stated that:

> [t]he key to deciphering the meaning of the executory contract rejection provisions is to work backward, proceeding from an examination of the purposes rejection is expected to accomplish. If those objectives have already been accomplished, or if they can't be accomplished through rejection, then the contract is not executory within the meaning of the Bankruptcy Act.

*Jolly*, 574 F.2d at 351.

The *Jolly* court identified two purposes that are served by the rejection of executory contracts in bankruptcy: (i) relieving the debtor of burdensome future obligations during the period that it is trying to recover financially, and (ii) creating a breach of contract which makes the other party to the contract a creditor with a claim that may be incorporated into a plan and ultimately discharged. *Jolly*, 574 F.2d at 350. The rejection of an executory contract can facilitate rehabilitation because the debtor may have no need for the executory contract or may simply be unable to meet the obligations under the contract as they fall due in the future. *Jolly*, 574 F.2d at 351. At the same time, rejection can protect the nondebtor party who occupies an equivocal position under bankruptcy law because, until the contract is rejected, the nondebtor party is not a creditor with a provable claim. *Jolly*, 574 F.2d at 351. To effect the purposes of rejection, the Sixth Circuit stated that the functional approach gives a trustee with an executory contract a choice of "whether [rejection] or [assumption] will be of the greatest benefit to the estate." *Jolly*, 574 F.2d at 351.

The functional approach articulated in *Jolly* is similar to the congressional approach in § 365 of the Bankruptcy Code in that it reflects a general reluctance to provide a precise definition of executory contracts. This approach has the conceptual advantage of using the underlying purposes of § 365 as benchmarks to define what constitutes an executory contract in bankruptcy. The functional approach is a result-oriented process, which looks first to the relative benefits and burdens to the estate of assumption or rejection, and then reasons backward to a determination of the executory nature of the contract in question. *Structurlite*, 86 B.R. at 928. This approach avoids some of the limitations of the Countryman definition by freeing bankruptcy courts to focus on the consequences of assumption or rejection of a contract in terms of the ensuing benefit to the estate and protection of creditors.[7] The functional approach has been employed and explained by a number of bankruptcy courts in other circuits.[8] Under this approach, courts determine the executoriness of a contract by the nature of the parties and the goals of the reorganization, not by mutuality of commitments. *Arrow Air v. Port Authority of New York and New Jersey (In re Arrow Air)*, 60 B.R. 117, 122

---

7. But note that the functional approach of defining executory contracts is not entirely separate and distinct from the Countryman definition. *Camp v. National Union Fire Insurance Co. of Pittsburgh (In re Government Securities Corporation)*, 101 B.R. 343, 348 n. 2 (Bankr.S.D.Fla. 1989). In fact, the functional approach was actually contemplated by Professor Countryman. Professor Countryman suggested that executory contracts be defined in light of the purpose for which the trustee is given the power to assume or reject: to benefit the estate. *Government Securities*, 101 B.R. at 348 [citing Country-

man, *Executory Contracts in Bankruptcy*, 57 Minn.L.Rev. 439, 450 (1973)].

8. *See, e.g., Drexel Burnham*, 138 B.R. 687; *Government Securities*, 101 B.R. at 348 n. 2 ["In applying the functional approach, it is necessary to work backward proceeding from an examination of the goals rejection is expected to accomplish."]; *In re G–N Partners*, 48 B.R. 462, 465–66 (Bankr.D.Minn.1985) [contract held executory based on an analysis of whether it would "add to or detract from the estate's benefit or liabilities"]; *Arrow Air*, 60 B.R. at 122; *Booth*, 19 B.R. at 56.

(Bankr.S.D.Fla.1986) [citing *In re Booth*, 19 B.R. 53, 56 (Bankr.D.Utah 1982)]. Furthermore, even though there may be material obligations outstanding on the part of only one of the parties to the contract, a contract may nevertheless be deemed executory under the functional approach if its assumption or rejection will ultimately benefit the estate and its creditors. *Arrow Air*, 60 B.R. at 122.

Thus, the Sixth Circuit has employed two different approaches to defining executory contracts in bankruptcy. Reading the *Jolly* and *Terrell* decisions together demonstrates that the Sixth Circuit has used "the traditional definition of an executory contract enunciated in the legislative history and refined by Countryman, [and] it has also applied a practical, or 'functional,' approach in its determination of whether or not a contract is executory in a rejection context." *See Structurlite*, 86 B.R. at 926. Both decisions remain good law in this circuit. The more recent decision in *Terrell* cites the *Jolly* decision with approval, and there is no evidence that the court sought to overrule the functional approach of *Jolly*. Therefore, in determining whether or not an agreement is executory, a bankruptcy court, at least in this circuit, must consider the applicability of both the functional approach and the Countryman definition.

■ This Court finds that the Credit Agreement between Huntington and CIMC is an executory contract under either the Countryman definition set forth in *Terrell* or the functional approach set forth in *Jolly*. Using the Countryman definition from *Terrell*, neither Huntington nor CIMC dispute that each has remaining obligations under the Credit Agreement. Their dispute centers on the issue of whether or not these remaining obligations are "material," so that the failure of one party to perform its remaining obligations would excuse the other from performance under Ohio contract law.

The thrust of Ameritrust's argument is that the Credit Agreement is, by design, constructed so that a breach by CIMC of any of its remaining obligations would not excuse Huntington from performance.

Ameritrust argues that this demonstrates that CIMC's remaining obligations are not material. As a result, the Credit Agreement should not be deemed to be executory. To support its argument, Ameritrust points to the terms of the Credit Agreement which provide that Huntington is still required to render one final performance despite the eventuality of CIMC's bankruptcy or of some other "event of default." On the other hand, Huntington simply argues that there are clearly remaining obligations for both parties and that courts have been quick to find executory contracts in circumstances such as this where lenders have unfulfilled loan commitments. *See Whinnery v. Bank of Onalaska (In re Taggatz)*, 106 B.R. 983, 991 (Bankr. W.D.Wis.1989) [finding that a contract is executory where the debtor owed on a note and the bank had not completely funded the note]; *Continental Experts Enterprises, Inc. v. Stowers (In re Continental Experts Enterprises, Inc.)*, 26 B.R. 308, 309 (Bankr.S.D.Fla.1982) [finding that the creditor's "obligation to complete funding as contemplated by the note and mortgage is, of course, an executory contract"]. Therefore, Huntington asserts that the Credit Agreement should be deemed executory.

Upon review of the Credit Agreement, this Court finds that, at the time of CIMC's filing for bankruptcy, performance remained due to some extent for both Huntington and CIMC under the Credit Agreement and that the failure of either party to perform would give rise to a material breach under Ohio contract law. Even should this Court accept Ameritrust's argument that the occurrence of an "event of default" under the terms of the Credit Agreement would not give rise to a material breach, the fact remains that there are other performances that remain under the Credit Agreement the breach of which would be material and would excuse performance by the non-breaching party. The most notable of these performances include the obligation of CIMC to cause Ameritrust to deliver the Certificates that are not remarketed to Huntington, the concomitant obligation of Huntington to disburse the funds agreed upon under the Credit Agree-

ment, and CIMC's resulting obligation to repay the advancement. These obligations constitute remaining 'material obligations on the part of CIMC and Huntington. The delivery of the Certificates to Huntington is a material term of the Credit Agreement. The Certificates serve to secure Huntington's extension of credit to CIMC, and the breach of this obligation by CIMC would clearly be material under Ohio contract law and would excuse Huntington from having to disburse funds to CIMC. On the other hand, the disbursement of funds by Huntington is undoubtedly a material term of the Credit Agreement, for it represents the very purpose contemplated by the Agreement. Absent CIMC's filing of bankruptcy, the breach of this obligation by Huntington would clearly be material under Ohio contract law and would excuse any further performance by CIMC. Thus, under the Countryman Definition set forth in *Terrell*, the Credit Agreement is an executory contract under § 365(a).[9]

Using the functional approach from *Jolly*, this Court must work backward and examine the purposes that the rejection of the Credit Agreement are expected to accomplish and, if these purposes have already been accomplished or cannot be accomplished through rejection, the Agreement is not executory.[10] The focus of this examination is on the consequences of rejection of the Credit Agreement in terms of its benefit to CIMC and its protection of CIMC's creditors. Rejection of the Credit Agreement may facilitate the rehabilitation of CIMC. As discussed below, CIMC can-

not assume the Credit Agreement and consequently has no use for it.[11] Rejection of the Credit Agreement would be CIMC's formal acknowledgement that the Credit Agreement has no value to the estate. Moreover, until CIMC rejects the Credit Agreement, the rights of the Certificateholders under the Pooling and Servicing Agreement are indeterminate. CIMC's rejection of the Credit Agreement would protect the Certificateholders by giving them a claim for breach of the Pooling and Servicing Agreement. Thus, under the functional approach set forth in *Jolly*, the Credit Agreement is an executory contract under § 365(a).

### B. Whether the Credit Agreement is an Executory Contract for the Financial Accommodations of CIMC

In the second issue before this Court, Huntington seeks a declaration of whether the Credit Agreement is an executory contract for the financial accommodation of CIMC under § 365(c)(2). Huntington argues that the Credit Agreement is for the financial accommodation of CIMC. Ameritrust does not directly oppose Huntington's argument. Rather Ameritrust argues that § 365(c)(2) is not applicable because the Credit Agreement is not executory, or in the alternative, that if § 365(c)(2) does apply, it should not prevent Ameritrust from enforcing Huntington's performance under the Credit Agreement. As stated above, the Court believes that the Credit Agreement is executory, thereby making it subject to § 365(c)(2). The Court will examine Ameritrust's second argument

---

**9.** Having determined that the Credit Agreement is executory under the Countryman definition, this Court need not address Huntington's general argument that contracts representing unfulfilled loan commitments are executory under the Countryman Definition. Neither of the cases proffered by Huntington on this point employed the Countryman definition of executory contracts.

**10.** As discussed below, the Credit Agreement cannot be assumed pursuant to § 365(c)(2) because it is a contract for the financial accommodation of CIMC. Therefore, this Court need only address the purposes of rejection in order to determine whether the Credit Agreement is executory.

**11.** Under a functional analysis, the issue of whether or not a contract is executory is more significant if assumption of the contract is desired. Rejection gives rise to a remedy in the non-debtor party for breach of the rejected contract. Rejection has no effect on the contract's continued existence—the contract is not cancelled, repudiated, rescinded, or in any other fashion terminated. *Drexel Burnham*, 1992 Bankr. LEXIS 366 [citing Andrew, Executory Contracts Revisited: A Reply to Professor Westbrook, 62 U.Colo.L.Rev. 1 (1991)]; *See also* Westbrook, *A Functional Analysis of Executory Contracts*, 74 Minn.L.Rev. 227 (1989). No harm arises from rejecting a contract that is not executory, at worst, such rejection would be superfluous.

below in the discussion of whether the protections of § 365(c)(2) may be waived by Huntington. The Court presently need only address the issue of whether the Credit Agreement is for the financial accommodation of CIMC.

Section 365(c)(2) of the Bankruptcy Code acts as a limitation of the power of the trustee to assume or reject an executory contract under § 365(a). Under § 365(c)(2), an executory contract that is a contract "to make a loan, or extend other debt financing or financial accommodations to or for the benefit of the debtor may not be assumed by the trustee." [12]

> The purpose of this subsection, at least in part, is to prevent the trustee from requiring new advances of money or other property. The section permits the trustee to continue to use and pay for property already advanced, but is not designed to permit the trustee [sic] to demand new loans or additional transfers of property under lease commitments. Thus, under this provision, contracts such as loan commitments and letters of credit are nonassignable, and may not be assumed by the trustee.

*In re TS Industries, Inc.*, 117 B.R. 682, 686 (Bankr.D.Utah 1990) [citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 348 (1977), U.S.Code Cong. & Admin.News 1978, p. 6304].

■ Although the Bankruptcy Code does not define the terms "loan," "debt financing," or "financial accommodations," the legislative history of § 365(c)(2) suggests that Congress intended these terms to be strictly construed so as not to extend "to an ordinary contract to provide goods and services that has incidental financial accommodations or extensions of credit." *Gill v. Easebe Enterprises, Inc. (In re Easebe Enterprises, Inc.)*, 900 F.2d 1417, 1419 (9th

Cir.1990) [citing 2 Collier On Bankruptcy, 365.05[1] (15th ed. 1989), citing 124 Cong. Rec. H11,093 (daily ed. Sept. 28, 1978) ]. Courts have defined the term 'financial accommodation' as the extension of money or credit to accommodate another. *Transamerica Commercial Finance Corporation v. Citibank, N.A. (In re Sun Runner Marine, Inc.)*, 945 F.2d 1089, 1092 (9th Cir.1991) [citing *In re Adana Mortgage Bankers, Inc.*, 12 B.R. 977, 986 (Bankr. N.D.Ga.1980); *Wegner Farms Co. v. Merchants Bonding Co. (In re Wegner Farms Co.)*, 49 B.R. 440 (Bankr.N.D.Iowa 1985); *In re Placid Oil Co.*, 72 B.R. 135, 139 (Bankr.N.D.Tex.1987) ].

In this matter, the Credit Agreement is clearly an executory contract for the financial accommodation of CIMC. The Credit Agreement is a revolving line of credit, the primary purpose of which is to enhance the liquidity, and thereby the marketability, of the Certificates. It is an extension of credit to CIMC that allows it to more easily sell its Certificates. Thus, the executory contract is not assumable by the trustee of CIMC's estate under § 365(c)(2).

C. **Whether the Protections of § 365(c)(2) Can be Waived by the Huntington's Prepetition Contractual Agreement to Make a Postpetition Disbursement of Funds to CIMC**

■ In the third issue before the Court, Ameritrust argues that Huntington has waived the protections of § 365(c)(2) by contracting in the Credit Agreement to make a postpetition disbursement of funds to CIMC. Ameritrust argues that the policy behind § 365(c)(2) only protects an "involuntary" creditor and is not applicable in circumstances where a lender has "voluntarily" consented to make a postpetition extension of credit.

---

**12.** 11 U.S.C. § 365(c)(2) provides in relevant part:

 (c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

 (2) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor;

The Court of Appeals for the Ninth Circuit has confronted the issue of whether the protections of § 365(c)(2) could be waived by a lender's consent. *See Sun Runner Marine,* 945 F.2d at 1089. In *Sun Runner Marine,* the Ninth Circuit held that § 365(c)(2) unambiguously prohibits the assumption of financial accommodation contracts, regardless of the consent of the non-debtor party. 945 F.2d at 1093. The Court stated that § 365(c)(2) is designed to protect not only the interests of the parties to the executory contract in question, but also the interests of the other creditors of the debtor. *Sun Runner Marine,* 945 F.2d at 1094 [citing *In re Placid Oil Co.,* 72 B.R. at 139]. If a debtor were allowed by a court to assume a financial accommodation contract, the claims of creditors who were not parties to the contract could be significantly affected. 945 F.2d at 1094. The assumption of a financial accommodation contract by a debtor may entitle "the non-debtor party to a distribution of estate assets on account of any pre-petition default, and to a priority claim on account of any post-petition default." *Sun Runner Marine,* 945 F.2d at 1094. The prohibition against the assumption of financial accommodation contracts of § 365(c)(2) "protects all unsecured creditors, not just the lender, and the lender's consent alone is not sufficient to abrogate it." *Sun Runner Marine,* 945 F.2d at 1093.

Moreover, the Ninth Circuit noted that 11 U.S.C. § 364 governs the postpetition extension of credit and that the Bankruptcy Code through § 365(c)(2) detached the function of prospective financing from existing credit arrangements. *Sun Runner Marine,* 945 F.2d at 1092. Any postpetition financing arrangements are thus governed solely by § 364, which provides certain incentives that a debtor may offer, with court approval, to induce a potential lender to extend credit postpetition. *Sun Runner Marine,* 945 F.2d at 1092. Reading § 365(c)(2) in conjunction with § 364, the Ninth Circuit stated that its interpretation that § 365(c)(2) is not dependent on the potential lender's lack of consent was consistent with the policy of the Bankruptcy Code. 945 F.2d at 1094.

Ameritrust offers *In re TS Industries, Inc.,* 117 B.R. 682 in support of its argument that the protections of § 365(c)(2) can be waived. In *TS Industries,* a creditor and a debtor agreed to a prepetition workout that was entered into by the parties with the express anticipation that the debtors would be filing bankruptcy in the near future and that the plan of reorganization would incorporate the terms of the workout. *TS Industries, Inc.,* 117 B.R. at 687. Thus, the lender who contracted to extend financial accommodations in *TS Industries* "knew that they would be financing a reorganized debtor-in-possession." *TS Industries,* 117 B.R. at 687. The facts of this case are readily distinguishable from the facts set forth in *TS Industries.* The provision of the Credit Agreement requiring Huntington to make a postpetition disbursement of funds to CIMC was clearly not a prepetition workout. There is no evidence that the parties entered into the Credit Agreement with the anticipation, express or otherwise, that CIMC would be filing bankruptcy in the near future.

Because this case is distinguishable on its facts, this Court need not address the issue presented in *TS Industries* of the impact that § 365(c)(2) has on the validity of a prepetition workout.

Thus, Huntington does not waive the protections of § 365(c)(2) as a result of its contracting in the Credit Agreement to make a postpetition disbursement of funds to CIMC. This recognizes the fundamental change in circumstances inherent in a bankruptcy filing and protects not only Huntington, but also the claims of the other creditors of CIMC.

## V. CONCLUSION

Based on the foregoing, this Court holds that the Credit Agreement between CIMC and Huntington is an executory contract that is for the financial accommodation of CIMC, and is thereby not assumable by CIMC's trustee under 11 U.S.C. § 365(c)(2). Huntington's motion for summary judgment on Count I of its complaint for declaratory relief must be, and the same is here-

by, granted. This decision further renders unnecessary any ruling on the relief requested in Count II of the Complaint.

This decision does not reach any issues of third-party contractual relationships between Huntington, on one hand, and Ameritrust, on the other, in its role as trustee for the Certificateholders. The third-party beneficiary rights of the Certificateholders against Huntington are separate and distinct and do not affect the Chapter 11 estate of CIMC. Resolution of those issues is left to another court. This Court notes, however, that, if another court should hold that Ameritrust, on behalf of the Certificateholders, may require Huntington to advance the funds under the Credit Agreement to the Certificateholders as the third-party beneficiaries of the Credit Agreement, Huntington may have a resulting claim against CIMC's estate for breach of the Credit Agreement. If another court should hold that Ameritrust may not require Huntington to advance the funds, Ameritrust may have a claim against CIMC's estate for breach of the Pooling and Servicing Agreement. This Court's decision is only that the Credit Agreement is an executory contract which is not capable of assumption by the Trustee. This Court is not finding that rejection by the Trustee on behalf of the estate would cancel or otherwise terminate the Credit Agreement. The effect of rejection will be a breach by the estate, the remedy for which cannot be specific performance against the estate. Other remedies which may exist in favor of other parties are not part of this litigation.

IT IS SO ORDERED.