In re TS INDUSTRIES, INC., a Nevada corporation, Debtor.

In re THERMAL SYSTEMS, INC., a Utah corporation, Debtor.

In re THERMAL SYSTEMS OF UTAH, INC., a Utah corporation, Debtor.

Bankruptcy Nos. 89C–04919 to 89C–04921.

United States Bankruptcy Court, D. Utah.

Aug. 14, 1990.

David E. Leta, Jim F. Lundberg, Hansen Jones & Leta, Salt Lake City, Utah, for Creditors' Committee for Thermal Systems, Inc.

Russell S. Walker, Walker Kennedy, III, Woodbury, Jensen, Kesler & Swinton, Salt Lake City, Utah, for Official Unsecured Creditors' Consol. Oversight Committee.

Noel S. Hyde, Steven F. Allred, Nielsen & Senior, Anna W. Drake, Allen Nelson Hardy & Evans, Salt Lake City, Utah, for TS Industries, Inc.

Douglas M. Monson, Enid Greene, Ray Quinney & Nebeker, Salt Lake City, Utah, for Fornco, M.V.

Weston L. Harris, Watkiss & Saperstein, Salt Lake City, Utah, for Bridgestone/Firestone, Inc.

Gale K. Francis, Tax & Business Div., Salt Lake City, Utah, for Utah State Tax Com'n.

Cynthia L. Futter, Milbank, Tweed, Hadley & McCloy, Los Angeles, Cal., for Credit Suisse.

Lon A. Jenkins, Leboeuf, Lamb, Leiby & MaCrae, Salt Lake City, Utah, for IBJ Schroder Bank & Trust Co.

John C. Loring, Chicago, Ill., for Prescott Ball & Turben, Inc.

Cheryl Howard Beals, Arvada, Colo., pro se.

James D. Porter, Won–Door Corp., Salt Lake City, Utah, for Won–Door Corp. and the Jay Smart Family.

## MEMORANDUM OPINION

GLEN E. CLARK, Chief Judge.

The matter presently before the court is a motion by TS Industries, Inc. ("TS"), seeking approval of its rejection of a contract ("Motion to Reject") which is commonly referred to by the parties as the "FORNCO Agreement." A hearing was held on June 25, 1990. Noel S. Hyde, Esq. and Steven F. Allred, Esq. appeared on behalf of TS. Anna W. Drake, Esq. appeared as special counsel to TS. Cynthia L. Futter, Esq. appeared on behalf of Credit Suisse. Douglas M. Monson, Esq. and Enid Greene, Esq. appeared on behalf of Fornco, N.V. ("Fornco"). James D. Porter, Esq. appeared on behalf of the Won–Door Corporation ("Won–Door") and the Jay Smart Family. David E. Leta, Esq. ap-

peared on behalf of Creditors' Committee for Thermal Systems, Inc. Lon A. Jenkins, Esq. appeared on behalf of IBJ Schroder Bank & Trust Company. Russell S. Walker, Esq. appeared on behalf of the Official Unsecured Creditors' Consolidated Oversight Committee. John C. Loring, Esq. appeared on behalf of Prescott Ball & Turben, Inc. Weston L. Harris, Esq. appeared on behalf of Bridgestone/Firestone, Inc. Gale K. Francis, Esq. appeared on behalf of the Utah State Tax Commission. Cheryl Howard Beals appeared *pro se.* Counsel presented evidence and argument, after which the court determined that: (1) To the extent that the FORNCO Agreement is an enforceable contract under Utah law, it is an executory contract to extend financial accommodations to TS; and (2) TS' Motion to Reject be denied without prejudice to refiling because it had presented insufficient evidence regarding the enforceability and/or feasibility of the Agreement upon which the court could allow or deny TS' motion. The court then took the matter under advisement to shed light on the issue of whether a pre-petition executory contract to extend financial accommodations to a debtor is capable of being assumed under § 365(a), notwithstanding the prohibitions of § 365(c)(2), if it was entered into by the parties in anticipation of bankruptcy. The court has carefully considered and reviewed the arguments of counsel, the memoranda submitted by the parties, and has made an independent review of the pertinent authorities. Now being fully advised, the court renders the following decision.

## BACKGROUND

On or about August 14, 1989, TS entered into the FORNCO Agreement with Won–Door, a Utah corporation which is a non-debtor, wholly owned subsidiary of TS; Fornco, a Netherlands Antilles corporation and shareholder of TS; Frank Shannon, a resident of the United Kingdom; Jay A. Smart Research, Ltd. ("JASR"), a Utah limited partnership; and Credit Suisse. The FORNCO Agreement attempts, *inter alia*, to reinstate TS' obligations to its debentureholders, restructure a TS–Credit Suisse line of credit, and provide for repayment of that line of credit through certain stock transactions with Fornco and JASR and financing by Won–Door. The Agreement is clearly a prebankruptcy workout as is evidenced by the following clause:

> WHEREAS, TS, together with its operating subsidiaries Thermal Systems, Inc., and Thermal Systems of Utah, Inc. (which subsidiaries are hereafter collectively referred to as "Thermal") plan to file in the near future petitions for reorganization under Chapter 11 of the Federal Bankruptcy Code and in connection therewith to seek Bankruptcy Court approval of the sale to Firestone Tire and Rubber Company ... of the assets of TS and Thermal used in the production of foam insulation products (the "Foam Asset Sale")[.]

(Debtor's Exhibit A at 1.) In addition, the Agreement states that it is expressly contingent on the consummation of the Foam Asset Sale [1] and confirmation of a plan of reorganization that is to "incorporat[e] or approv[e] the terms of this Agreement." (*Id.* at 1–2.)

On August 17, 1989, TS, Thermal Systems Inc., and Thermal Systems of Utah, Inc. ("the debtors") filed petitions for relief under Chapter 11 of the Bankruptcy Code. The debtors' cases have been administratively consolidated, and they have continued to operate their businesses as debtors-in-possession.[2]

Sometime after TS filed bankruptcy it decided that the FORNCO Agreement was not feasible. Accordingly, on May 31, 1990, it filed the present motion. The debtors' proposed plan of reorganization assumes that the court will grant TS' Motion to Reject. The Official Unsecured Creditors' Consolidated Oversight Committee has proposed a competing plan of reorganization, however, which incorporates the terms of the FORNCO Agreement.

---

1. On September 12, 1989, the court entered an order approving the Foam Asset Sale.

2. The debtors' motion to substantively consolidate their estates is pending.

In support of the Motion to Reject, TS and all of-the other parties to the FORNCO Agreement argue, in relevant part, that the Agreement is non-assumable under § 365(c)(2) because it is a contract to extend debt financing or financial accommodations. On the other hand, several of TS' creditors who are not parties to the FORNCO Agreement oppose the Motion to Reject claiming that the Agreement is capable of being assumed under § 365(a) because § 365(c)(2) does not apply to pre-petition agreements, such as the one in the present case, that are entered into in anticipation of bankruptcy.

## DISCUSSION

■■■ Pursuant to § 365(a), the debtor-in-possession, may, with the court's approval, "assume or reject any executory contract or unexpired lease of the debtor." This section allows the debtor-in-possession to assume contracts that are beneficial to the estate and reject those that are burdensome thereby facilitating its reorganization. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 221 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. In Chapter 11 cases, the debtor-in-possession may assume or reject an executory contract at any time before confirmation of the plan. 11 U.S.C. § 365(d)(2). Moreover, pursuant to § 1123(b)(2), executory contracts may be assumed, rejected, or assigned in a plan of reorganization. Generally, § 365 only applies to executory contracts that were entered into by the debtor pre-petition; *In re IML Freight, Inc.*, 37 B.R. 556 (Bankr.D. Utah 1984); and the court applies a "business judgment test" in determining the propriety of the debtor's decision to assume or reject such a contract. *In re Tilco, Inc.*, 558 F.2d 1369, 1372–73 (10th Cir.1977); *In re Summit Land Co.*, 13 B.R. 310, 314–16 (Bankr.D.Utah 1981). Under § 365(e)(1),[3] creditors, for the most part, cannot contractually protect themselves from having their contracts assumed by a debtor-in-possession because that section invalidates *ipso facto* clauses that terminate a contract or modify its terms in the event of a bankruptcy. This subsection is in accord with the general purpose of § 365 of providing the debtor-in-possession with a fair chance of rehabilitation. *See* S.Rep. No. 989, 95th Cong., 2d Sess. 59 (1978); H.R.Rep. No. 595, 95th Cong., 1st Sess. 348 (1977) (recognizing that "ipso facto or bankruptcy clauses" can hamper a debtor's reorganization).

Notwithstanding § 365(a), § 365(c) prohibits the debtor-in-possession from assuming certain types of contracts. Relevant to this case is § 365(c)(2) which contains a specific prohibition against the assumption or assignment of a contract of the debtor if "such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor[.]" Although the original bill that was proposed in the House of Representatives did not contain a specific prohibition against a debtor-in-possession's assumption of contracts to extend financial accommodations; H.R. 8200, 95th Cong., 1st Sess. § 365(c) (1977); the Report by the Commit-

---

**3.** 11 U.S.C. § 365(e) states, in relevant part, that:
(1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case soley because of a provision in such contract or lease that is conditioned on—
(A) the insolvency or financial condition of the debtor at any time before the closing of the case;
(B) the commencement of a case under this title; or

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.
(2) Paragraph (1) of this subsection does not apply to an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

.     .     .     .     .

(B) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor.

tee on the Judiciary which accompanied the bill stated that:

> The purpose of this subsection, at least in part, is to prevent the trustee from requiring new advances of money or other property. The section permits the trustee to continue to use and pay for property already advanced, but is not designed to permit the trusee [sic] to demand new loans or additional transfers of property under lease commitments.
>
> Thus, under this provision, contracts such as loan commitments and letters of credit are nonassignable, and may not be assumed by the trustee.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 348 (1977), U.S.Code Cong. & Admin.News 1978, p. 6304. H.R. 8200 was subsequently amended after hearings in the Senate in which it was recognized by several parties that is was necessary to specifically "preclude the preposterous situation of lending institutions being required to make loans to a bankrupt." *Hearings on S. 2266 & H.R. 8200, Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary*, 95th Cong., 1st Sess. 576 (1977) (statement of Robert J. Grimming). The report that accompanied the Senate amendment stated that "[t]he purpose of this subsection is to make it clear that a party to a transaction which is based upon the financial strength of a debtor should not be required to extend new credit to the debtor in the form of loans, lease financing, or the purchase or discount of notes." S.Rep. No. 989, 95th Cong., 2d Sess. 58–59 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5844–5845. Thus, § 365(c)(2) was enacted in its present form

which, as noted, specifically bars a debtor-in-possession from assuming executory contracts to extend loans, debt financing, or financial accommodations that were made to or for its benefit. Paralleling § 365(c)(2) is § 365(e)(2)(B) which exempts *ipso facto* clauses in contracts that extend loans, debt financing, or financial accommodations to a debtor from being invalidated under subsection (e)(1).

Reading § 365(c)(2) and (e)(2)(B) together, it is clear that Congress intended to protect creditors who have entered into pre-petition agreements to extend financial accommodations to a debtor from being required to extend money or accommodations to it post-petition if the contract that it entered into was totally or partially unperformed when the debtor filed bankruptcy.[4] These sections prevent a creditor from being required to involuntarily finance a debtor-in-possession's reorganization effort based on a contract that it negotiated without knowledge that the debtor would be filing bankruptcy. In an article discussing the assumability of credit contracts in bankruptcy, the author points out that:

> While [the non-assumability of credit contracts in § 365(c)(2)] might not appear debatable, it could be argued that any creditor whose contract is assumed is adequately protected. Under current law, after a contract is assumed, breach of the resulting obligation is treated as an administrative expense. This does not guarantee full performance (i.e., repayment) of the assumed loan, but does substantially increase the likelihood of

---

**4.** Although numerous courts have stated the purpose of 11 U.S.C. § 365(c)(2); *see, e.g., In re Easebe Enter., Inc.,* 900 F.2d 1417, 1419 (9th Cir.1990); *In re Charrington Worldwide Enter., Inc.,* 110 B.R. 973, 975 (M.D.Fla.1990); *In re Taggatz,* 106 B.R. 983, 990–91 (Bankr.W.D.Wis. 1989); *In re The Travel Shoppe, Inc.,* 88 B.R. 466, 470 (Bankr.N.D.Ga.1988); *In re Farrell,* 79 B.R. 300, 304 (Bankr.S.D.Ohio 1987); *In re Placid Oil Co.,* 72 B.R. 135, 139 (Bankr.N.D.Tex. 1987); *In re United Press Int'l, Inc.,* 55 B.R. 63, 66 (Bankr.D.C.1985); *In re Wegner Farms Co.,* 49 B.R. 440, 444 (Bankr.N.D.Iowa 1985); *In re Postle Enter., Inc.,* 48 B.R. 721, 723–24 (Bankr.D. Ariz.1985); *In re New Town Mall,* 17 B.R. 326, 328 (Bankr.S.D.1982); none have addressed the

particular problem at issue in this case. Although the parties have pointed to *In re Swift Aire Lines, Inc.,* 30 B.R. 490 (9th Cir. BAP 1983), as controlling, the court finds that case to be inapposite. In *Swift Aire,* the court held that a letter of credit issued to benefit a debtor who subsequently filed a petition under Chapter 7 of the Code was an executory contract to extend financial accommodations and, therefore, could not be enforced by the trustee despite a contract between the applicant and co-beneficiary creditor bank that the letter of credit could be drawn upon by the debtor even if it filed bankruptcy. The court's disregard of the underlying contract was based on letter of credit law.

full payment. In any event, some risk of nonperformance is inherent in any assumed executory contract and in any credit contract. The risk in an assumed credit contract would differ in type, but not in degree.

The fact that Section 365 rejects this view is a significant comment on the appropriate interpretation of all provisions relating to assumption of contracts. The rejection of this view is based in part on a desire to channel post bankruptcy lending through another Code provision. More significantly, it is a *recognition of the change in circumstances inherent in a bankruptcy filing, even if some assurance of repayment is provided. The financial circumstances of the debtor are of course fundamental considerations in any credit contract. Presumably, these circumstances were assessed in entering the contract to make a loan. The risk of bankruptcy was accounted for, but that risk had not yet matured before the loan was made.* Bankruptcy dramatically alters the assumptions under which the contract was arranged. Independent of any contract terms, Section 365 adopts the optimal remedy from the creditor's standpoint. It releases the creditor from the contract by precluding assumption. The creditor is then allowed to reassess the desirability and terms for offering credit to the debtor in light of its changed circumstances.

.     .     .     .     .

*[T]he general theme in executory credit transactions is to recognize a bankruptcy filing as a fundamental change in circumstances that provides the nonbankrupt with a right to reassess or, at least, demand performance assurances. This approach is essential to fully protect the party who has already entered into an executory credit agreement. It is also important as a means of facilitating such contract arrangements by debtors in financial distress.* In absence of such protection, already expensive credit arrangements would become more expensive or difficult to obtain as the perceived risk of

bankruptcy increases since the creditor would not only risk loans already made, but also the possibility of being forced to extend further credit after bankruptcy. Nimmer, *Executory Contracts in Bankruptcy: Protecting the Fundamental Terms of the Bargain,* 54 UNIV.COLO.L. REV. 507, 533–34, 536 (1983) (footnotes omitted) (emphasis added), *cited with approval in, LJC Corp. v. Boyle,* 768 F.2d 1489, 1492 (D.C.Cir.1985); *R & O Elevator Co. v. Harmon,* 93 B.R. 667, 671 (D.Minn. 1988); *In re White Motor Corp.,* 44 B.R. 563, 568–69 (N.D.Ohio 1984) (discussing Nimmer's theory that § 365 must be interpreted so as to balance bankruptcy goals of optimal distribution and rehabilitation with general contract law policies that encourage use of contractual relationships).

■ Given this background, the court concludes that § 365(c)(2) does not bar TS from assuming the FORNCO Agreement even though it is an executory contract to extend financial accommodations. The basis of the court's holding is that the FORNCO Agreement clearly is not the type of agreement that was contemplated as being barred from assumption under § 365(c)(2). Specifically, the Agreement is a pre-petition workout that was entered into by the parties in anticipation of TS filing bankruptcy. As noted, the Agreement expressly anticipates that the debtors would be filing bankruptcy in the near future and that the plan of reorganization would incorporate its terms. Thus, the parties who contracted to extend financial accommodations to TS knew that they would be financing a reorganized debtor-in-possession. Accordingly, the bankruptcy filing in this case simply is not a fundamental change in circumstances to warrant the parties reassessing their deal through the tool of non-assumption under § 365(c)(2).

In addition to the purpose of § 365(c)(2), the present case is analogous to cases which have stated that that subsection will not prevent assumption if the parties to the financial accomodations contract consent to its assumption after the debtor files a bankruptcy petition. *See In re Prime, Inc.,* 15 B.R. 216, 218 (Bankr.W.D.Mo.1981)

("Read literally [§ 365(c)(2)] prohibits assumption [of a contract for financial accommodations] whether the creditor consents or not.... The court is satisfied that, read in context of the statutory powers given the trustee to operate a business, Section 365(c)(2) does permit assumption of a debt financing arrangement [with the consent of the creditors].") *See also In re Charrington Worldwide Enterp., Inc.*, 98 B.R. 65, 68 (Bankr.M.D.Fla.1989), *aff'd*, 110 B.R. 973 (M.D.Fla.1990); *In re Adana Mortg. Bankers, Inc.*, 12 B.R. 977 (Bankr.N.D.Ga. 1980) (assuming consent as ground for assumption of financial accommodations contracts notwithstanding the plain language of § 365(c)(2)). In this case, the parties to the FORNCO Agreement consented pre-petition to a post-confirmation extension of financial accommodations to TS.

Finally, the court's conclusion that the FORNCO Agreement is capable of being assumed under § 365(c)(2) is in accord with the legislative history of the Bankruptcy Code favoring "workouts," or "private, negotiated adjustments of creditor-company relations." *In re Colonial Ford, Inc.*, 24 B.R. 1014, 1015 (Bankr.D.Utah 1982).[5] For example, the report that accompanied H.R. 8200 stated that bankruptcy laws would serve as an "alternative" if mutual agreements necessary for a workout could not be reached between a debtor and its creditors. H.R.Rep. No. 595, 95th Cong., 1st Sess. 220 (1977) (citing *Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary*, 94th Cong., 1st Sess., ser. 27, pt. 1, at 436–37 (1975–76) [hereinafter cited as *Hearings*]). Toward this end, the authors of the Code encouraged workouts in at least two ways. "First, the Code, '[l]ike a "fleet-in-being" ... may be a force towards mutual accommodation,' and as such, sets parameters for negotiations preceding a workout." *Colonial Ford*, 24 B.R. at 1017 (quoting *Hearings* at 396); *see* T. JACKSON, THE LOGIC AND LIMITS OF BANKRUPTCY LAW 17 (1986) ("Bankruptcy law stipulates a minimum set of entitlements for claimants.

That, in turn, permits them to 'bargain in the shadow of the law' and to implement a consensual collective proceeding outside of the bankruptcy process."); Aaron, *The Bankruptcy Reform Act of 1978: The Full-Employment-For-Lawyers Bill Part V: Business Reorganization*, 1982 UTAH L.REV. 1, 16 ("The policy choices expressed in Chapter 11 are less statutory guides to conduct than contrasts by which to measure choice; the sections of the chapter are less mandates to be followed than bargaining chips allocated liberally to the participants. The real purpose of the statutory provisions is to threaten reluctant bargainers to grant concessions that will avoid resort to the statute."); Jackson, *Bankruptcy, Non–Bankruptcy Entitlements, and the Creditors' Bargain*, 91 YALE L.J. 857, 867 (1982) ("formal bankruptcy process would presumably be used only when individualistic 'advantage-taking' in the setting of multi-party negotiations makes a consensual deal to costly to strike...."). "Second, the Code, in several specific respects, contemplates that workouts will be a prelude to, yet [be] consummated in, bankruptcy.... Indeed, incentives to use 'prepackaged plans' are 'written all through the new Act.'" *Colonial Ford*, 24 B.R. at 1017 (quoting *Aaron*, *supra*, at 38). "Prepackaged plans" are specifically contemplated in the Code as is evidenced by § 1102(b)(1) which allows a pre-petition creditors committee to act as the committee in bankruptcy if it is representative of the claims and interests in the case, § 1121(a) which allows the debtor to file a plan with its Chapter 11 petition, and § 1126(b) which provides for pre-petition solicitation. *See generally* M. BIENENSTOCK, BANKRUPTCY REORGANIZATION 662–64 (1987); 5 Collier Bankr. Practice Guide ¶ 90.07[3] (MB) (Mar.1985); *Aaron*, *supra*, at 37–39; Trost, *Business Reorganizations Under Chapter 11 of the New Bankruptcy Code*, 34 BUS.LAW. 1309, 1324–25 (1979) (discussing "prepackaged" Chapter 11 plans). Plans that are negotiated between a debtor and its creditors prior

---

**5.** Prior to the enactment of Chapter 11, a long history of law existed pertaining to privately negotiated workouts. *See generally In re Jeppson*, 66 B.R. 269 (Bankr.D.Utah 1986).

to a Chapter 11 filing are preferable in most instances because they generally reflect a well thought-out reorganization attempt. *See Aaron, supra,* at 39–40. In addition, pre-petition plans are attractive because they reduce the time and expense of litigation and, therefore, allow the debtor to commence its reorganized operations as soon as possible. *Id.; see also* Collier, *supra,* at ¶ 90.07[3]; Trost, *supra,* at 1324.

In *Colonial Ford,* 24 B.R. at 1014, this court discussed in detail the emphasis in the Code favoring workouts. In that case, the debtor, an automobile dealership, and its creditors entered into a workout agreement in lieu of the debtor filing bankruptcy. The debtor subsequently filed bankruptcy when it failed to get financing as required by the terms of the agreement and foreclosure of its dealership site became imminent. The bankruptcy court abstained and dismissed the case pursuant to § 305(a)(1) citing the policy set forth in that section of encouraging out-of-court workouts. Attempting to assure the future legitimacy of workout agreements, the court stated that it would not abandon an out-of-court workout where it was clear that the debtor had agreed to compose its debts outside of the court system and then attempted to "ambush" its creditors in Chapter 11. *Colonial Ford,* 24 B.R. at 1020.

Although there is not evidence before the court that the FORNCO Agreement is a "prepackaged plan," it is clear that the Code contemplates agreements similar to it in which lenders are given claims against the estate for post-petition financing, and funding of the plan will come, in part, from a subsidiary of the debtor-in-possession. If the court were to conclude that the FORNCO Agreement is a non-assumable executory contract under § 365(c)(2) it would render meaningless all future pre-petition contracts to extend the debtor post-confirmation financial accommodations. Such a holding would be contrary to the Code's policy of favoring workouts, and, therefore, the court will not so hold.

■ Precluding pre-petition workouts entered into in anticipation of bankruptcy from the scope of § 365(c)(2) does not make such contacts immune from rejection under

§ 365(a). After it files bankruptcy, the debtor-in-possession may move the court to approve its decision to reject such a contract at any time prior to confirmation of its plan of reorganization if it determines that it is not in its best interest to assume. As provided for in § 365(a) and Bankruptcy Rule 6006, however, such a motion will be subject to notice and a hearing wherein parties-in-interest can object to it and attempt to establish that rejection of the contract would be an abuse of the debtor-in-possession's business judgment. If the debtor-in-possession seeks rejection of the workout in its plan of reorganization pursuant to § 1123(b)(2), the confirmation process is sufficient for parties-in-interest to raise objections to its rejection. Alternatively, parties-in-interest can formulate a competing plan of reorganization which incorporates the workout and seek its confirmation.

Accordingly, since the FORNCO Agreement is a pre-petition workout that was entered into by the parties in anticipation of TS filing bankruptcy, it is capable of being assumed under § 365(a), notwithstanding the fact that it is an executory contract to extend financial accommodations.