In re Paul K. BOUTIETTE, Debtor.

Thomas K. STEELE, Plaintiff,

v.

Paul K. BOUTIETTE, Defendant.

Bankruptcy No. 92–40701–HJB.
Adv. No. 92–4270.

United States Bankruptcy Court,
D. Massachusetts.

June 21, 1994.

Thomas M. Flannagan, Sterling, MA, for Thomas K. Steele.

Carl D. Aframe, Worcester, MA, for Paul K. Boutiette.

Matthew Rockman, Chapter 7 Trustee.

### MEMORANDUM

HENRY J. BOROFF, Bankruptcy Judge.

## I. INTRODUCTION

The matter before the Court is an adversary proceeding brought by Thomas K. Steele (the "Plaintiff") against Paul K. Boutiette (the "Debtor" or "Defendant"), pursuant to 11 U.S.C. §§ 523 and 727. Pursuant to the Plaintiff's Complaint, the Plaintiff seeks that his claim be deemed non-dischargeable under § 523(a)(2) (Count I) and that the Debtor be denied a discharge under § 727(a)(2)(B) (Count II), § 727(a)(3) (Count III), § 727(a)(4)(A) (Count V) and § 727(a)(4)(D) (Count IV).

Prior to the commencement of trial, the Plaintiff withdrew his allegations with respect to § 727(a)(3) (Count III). After the first day of trial, and after the Plaintiff rested, the Court granted judgment for the Debtor with respect to the Plaintiff's allega-

tions under § 523(a)(2) (Count I) for failure to meet his burden of proof.[1] After completion of the trial on February 2, 1994, the balance of the Plaintiff's allegations under §§ 727(a)(2)(B), 727(a)(4)(A) and 727(a)(4)(D) were taken under advisement and consideration of those issues are the subject of this opinion. The parties submitted proposed findings of fact and conclusions of law as well as post-trial memoranda.

### (a) Factual Background

As of the date of the filing of the petition and during all relevant periods prior thereto and since, the Debtor and his spouse, Pauline A. Boutiette, have held ninety-five percent and five percent beneficial interests, respectively, in a nominee trust known as the Kings Campground Realty Trust (the "Trust"). The Trust in turn holds legal title to a campground facility known as "Kings Campground" (the "Campground"), consisting of 120 campground sites and a variety store adjoining Lake Manchaug in Sutton, Massachusetts. In the warmer months, the Campground is in the business of renting camping sites and derives revenue from site rental fees, store receipts and dock rentals. During the winter months, the Campground derives revenue from storage and accepts deposits for summer rentals. During all relevant periods, the Debtor has exercised complete control over the operation and maintenance of the Campground.

In Schedule "B" of his petition, filed under oath pursuant to Bankruptcy Rule 1008, the Debtor listed the value of his 95% interest in the Campground[2] at $536,917.58[3] and the encumbrances thereon at $713,000.00. In Schedule "F",[4] the Debtor listed the encumbrances on the Campground in the following amounts:

---

1. The basis for the Court's determination was read into the record and is incorporated herein by reference.

2. Schedule "B" actually reflects his interest in the Trust, whose only asset is the Campground.

3. The record is unclear as to whether the value stated represents all or just 95% of the total value. However, the difference is not material here.

4. The debts were listed in Schedule "F" because the Debtors had executed unsecured personal guarantees of the debts owed by the Trust.

| Unibank for Savings (first mortgage) | – $ | 212,000 |
| Bank of Boston (second mortgage) | – | 41,400 |
| FDIC (Heritage Bank for Savings) (third mortgage) | – | 460,000[5] |
| | | $ 713,000 |

In Schedule "G" (Executory Contracts), only the word "None" was inserted.

The third mortgage (the "Heritage Mortgage") held by the FDIC on the Campground also secures other obligations of the Boutiettes, and all of the said obligations to Heritage were in default as of June 5, 1991. On June 5, 1991, the Boutiettes and Heritage entered into an agreement (the "Heritage Agreement"), pursuant to which Heritage agreed to accept the sum of one hundred fifty thousand ($150,000.00) Dollars, payable over an extended period of time, in full settlement of all of the obligations of the Boutiettes to Heritage. The Heritage Agreement [6] also provided:

2. The Mortgage shall remain as security for Boutiette's obligations hereunder, and by his execution hereof he ratifies and reaffirms his obligations under the Mortgage. The Mortgage shall be discharged upon payment of the Settlement Amount.
3. In the event of a default hereunder by Boutiette, which default remains uncured for fifteen (15) days, the Bank's agreement to accept from Boutiette the Settlement Amount shall terminate and the Bank shall have the right to seek collection of the entire balance due under the Note.

In view of the foregoing, absent a default of the Heritage Agreement, the Trust's sole asset valued at $536,917.58 would be encumbered by mortgages reduced to a total of $403,000.00 [7], leaving equity of $133,917.58. However, the Heritage Mortgage [8], ratified and reaffirmed under the Heritage Agreement, provided:

12. If proceedings under any Bankruptcy or insolvency law are commenced by or against Mortgagor, or if a general assignment for the benefit of creditors is made by Mortgagor, or if a trustee, trust mortgage, custodian or receiver of Mortgagor's property be appointed, then a default in the provisions and covenants of this Mortgage shall occur.

Therefore, pursuant to paragraph 3 of the Heritage Agreement, a default by the Debtor would reinstate the full amount of the obligation to Heritage. According to paragraph 12 of the Heritage Mortgage, the filing of a case under the Bankruptcy Code would be deemed such a default.

On March 12, 1992, the Debtor filed a petition under Chapter 7 of the Bankruptcy Code and, shortly thereafter, a Trustee in Bankruptcy was appointed. On or about May 21, 1992, a meeting was held with the Trustee pursuant to 11 U.S.C. § 341, at which meeting the Debtor was examined by the Trustee. However, neither at said meeting nor at any time thereafter prior to the filing of this Adversary Proceeding, did the Debtor disclose to the Trustee the existence of the Heritage Agreement. Based on the Trustee's belief that the Campground had no equity, the Trustee failed to request that the Debtors turn over the books and records of the Campground or the ongoing Campground revenues. In addition, the Trustee failed to take possession of the Campground or take any steps to liquidate the estate's interest in the Trust. Notwithstanding the Trustee's inaction, the Debtor continued post-petition to (i) make payments to the FDIC in accordance with the terms of the Heritage Agreement, (ii) collect revenue from the Campground for his personal benefit, and (iii) represent in financial statements, prepared for third parties, post-petition, that the debt to the FDIC was in the reduced amount.

The Plaintiff, a creditor in the case, argues that the Heritage Agreement was an executory contract which could have been assumed by the Trustee pursuant to 11 U.S.C. § 365, and, if assumed, the estate would have enjoyed substantial equity in the Trust and Campground. The Plaintiff further argues that the Heritage Agreement was assumable because (i) the Debtor was not in default under the Heritage Agreement as of the date

---

**5.** As of the date of filing, Heritage Bank for Savings ("Heritage") had failed and its assets are being administered by the FDIC.

**6.** See Plaintiff's Exhibit No. 1.

**7.** Unibank ($212,000.00); Bank of Boston ($41,-000.00); Heritage ($150,000.00).

**8.** See Defendant's Exhibit No. 8.

of the filing of the petition, and (ii) the default occasioned by the filing of this case was effectuated by a so-called "ipso facto" clause which may be disregarded, pursuant to 11 U.S.C. § 365(e)(1).[9] Finally, the Plaintiff argues that (i) the failure of the Debtor to disclose the Heritage Agreement (or its resultant reduction of debt) on the bankruptcy schedules either in Schedule "G" or in some other fashion, constituted a knowing and fraudulent false oath for which discharge should be denied under § 727(a)(4)(A)[10]; (ii) the failure of the Debtor to turn over the Campground's records to the Trustee constituted a withholding of recorded information for which a discharge should be denied under § 727(a)(4)(D); and (iii) the failure of the Debtor to turn over the Campground revenues to the Trustee constituted an intentional transfer or concealment of property of the estate after the filing of the petition, for which a discharge should be denied, pursuant to § 727(a)(2)(B).

9. Section 365(e)(1) provides:

(e)(1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; or

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

11 U.S.C. § 365(e)(1).

10. Section 727(a) provides in relevant part:

(a) the court shall grant the debtor a discharge, unless ...

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to the transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition. . . .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

The Debtor argues that he had no intention to defraud the Trustee. He claims, firstly, that the Heritage Agreement did not constitute an executory contract and, secondly, even if it did, the agreement was not assumable by the Trustee because it was a contract to extend debt financing or financial accommodations and therefore, barred from assumption, pursuant to § 365(e)(2)(B).[11] Because he claims that he believed the Heritage Agreement not to be assumable, the Debtor also claims that did not believe that he (i) knowingly and fraudulently omitted reference to the Heritage Agreement in the schedules; or (ii) improperly failed to turn over the Campground's books and records or revenues to the Trustee.

## II. DISCUSSION

### (a) Count V under § 727(a)(4)(A)

On three occasions in the last twenty years, the First Circuit Court of Appeals has

(B) presented or used a false claim;

(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs[.]

11 U.S.C. § 727(a)(2), (a)(4).

11. Section 365(e)(2)(B) provides in relevant part:

(2) Paragraph (1) of this subsection does not apply to an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if . . .

(B) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor.

11 U.S.C. 365(e)(2)(B).

The Court would note, however, that 11 U.S.C. § 365(c)(2) appears the more applicable subsection of section 365 in that it provides in relevant part:

(c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if . . .

(2) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor.

11 U.S.C. § 365(c)(2).

written on the issue of whether the non-disclosure of an asset in the bankruptcy schedules or to a Trustee justifies the denial of a debtor's discharge. On each occasion, the Court has emphasized the critical need for a debtor's full disclosure.

In the case of *In re Mascolo,* 505 F.2d 274 (1st Cir.1974), decided under Section 33 [12] of the Bankruptcy Act, the debtor had failed to list two (2) different bank accounts in his Schedules. Affirming the referee's denial of the debtor's discharge, the court noted that "[t]he successful functioning of the Bankruptcy Act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." 505 F.2d at 278.

In the sharply worded decision of *Boroff v. Tully (In re Tully),* 818 F.2d 106 (1st Cir. 1987), the Court returned to the issue. In the *Tully* case, the debtor had turned over all of his books and records to the Trustee, but had omitted the listing of certain assets from his schedules, notwithstanding two amendments thereof. Affirming the bankruptcy judge's denial of discharge under § 727(a)(4)(A), the court ruled that a discharge may be denied under § 727(a)(4)(A) if a debtor (1) knowingly and fraudulently makes a false oath (2) relating to a material fact. In finding that the denial of discharge in that case was appropriate, the Court chastised:

> the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in the interest based on fact rather than fiction.... Neither the trustee nor creditors should be required to engage in laborious

tug-of-war to drag the simple truth into the glare of daylight.

818 F.2d at 110.

Nor did the *Tully* court find it significant that the debtors in *Tully* turned records over to the trustee from which the existence of the omitted assets might have been gleaned or that the debtor's counsel accepted responsibility for the omission on the schedules.

> *A petitioner cannot omit items from his schedules, force the trustee and the creditors, at their peril, to guess that he has done so—and hold them to a mythical requirement that they search through a paperwork jungle in the hope of finding an overlooked needle in a documentary haystack.* Nor can an attorney's willingness to bear the burden of reproach provide blanket immunity to a debtor; it is well settled that reliance upon advice of counsel is, in this context, no defense where it should have been evident to the debtor that the assets ought to be listed in the schedules. *See Mascolo,* 505 F.2d at 277 n. 4; *In re Russell,* 52 F.2d 749, 754 (D.N.H.1931); [*In re*] *Nazarian,* 18 B.R. [143] at 147 [ (1982) ]. A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath.

818 F.2d at 111. (emphasis supplied).

Finally, the First Circuit returned to the issue in the case *Commerce Bank & Trust Co. v. Burgess (In re Burgess),* 955 F.2d 134 (1st Cir.1992). In the *Burgess* case, the plaintiff Bank claimed that the debtor had made numerous misstatements on his bankruptcy schedules, but the bankruptcy judge declined to deny the debtor's discharge. In affirming the bankruptcy judge, the *Burgess* Court embraced its decision in the *Tully* case, but held that proof of materiality in the case before it was insufficient. 955 F.2d at 137.

---

**12.** Former 11 U.S.C. § 33 provides in relevant part:

> The Court may revoke a discharge upon application of a creditor ... who has not been guilty of laches, filed at any time within one year after a discharge has been granted, if it shall appear (1) that the discharge was ob-

tained through the fraud of the bankrupt, that the knowledge of the fraud has come to the applicant since the discharge was granted, and that the facts did not warrant the discharge[.] Bankruptcy Act of 1898 § 15, 11 U.S.C. § 33 (repealed 1978).

In the case at bar, this Court must determine whether the Heritage Agreement should have been listed on the bankruptcy schedules, and, if so, whether its omission was knowing, fraudulent and material.

■ Pursuant to § 365(a) [13], a trustee may assume or reject any executory contract or unexpired lease of the debtor. 11 U.S.C. § 365(a). The Bankruptcy Code provides little guidance on the meaning of "executory contract" within the context of the governing statutory provision. The legislative history, however, provides that the term "generally includes contracts on which performance remains due to some extent on both sides." H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 58 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5844, 6303. This definition embraces Professor Countryman's definition of executory contracts under the former Bankruptcy Act. "A contract under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn.L.Rev. 439, 460 (1973).

■ The Heritage Agreement specifically provides that the Debtor may fully satisfy his obligation under the original notes by paying the bank one hundred fifty thousand dollars ($150,000) over an extended period of time. The Debtor argues that such an agreement is nothing more than a revised note and mortgage and that the mere acceptance of payment by the bank is hardly the type of performance contemplated in an executory contract. The Court agrees. The bank's obligation under the Heritage Agreement is the release of the Debtor from a larger underlying obligation if certain conditions are met. Such a so-called "workout agreement" may be an executory contract if the lender has affirmative obligations thereunder, the performance of which could be excused by the debtor's non-payment (e.g., new financing). Cf. *In re TS Industries, Inc.*, 117 B.R. 682, 687 (Bankr.D.Utah) (prepetition workout included obligations to extend financial accommodations to reorganized debtor). In the case at bar, however, Heritage had no such obligations. No obligations of Heritage even arise until after the Debtor has fully performed. This Court adopts the Countryman definition and, therefore, finds that the Heritage Agreement is not an executory contract. The Heritage Agreement need not have been listed on Schedule "G" of the bankruptcy schedules.

■ Even if the Court had determined that the Heritage Agreement was an executory contract and its existence omitted from Schedule "G", the *Burgess* decision instructs that the inquiry not end with the identification of an omission. The omission must be *knowing, fraudulent* and *material. See Burgess*, 955 F.2d at 137 (emphasis supplied). Notwithstanding a trustee's power to assume executory contracts under § 365(a), 11 U.S.C. § 365(c)(2) [14] contains a specific prohibition against assumption or assignment of a contract to make a loan or extend other debt financing or financial accommodations, to or for the benefit of the debtor. 11 U.S.C. § 365(c)(2). Additionally, § 365(e)(2)(B) parallels § 365(c)(2) by exempting "ipso facto" clauses from invalidation in contracts that extend loans, debt financing, or financial accommodations. Because, in the instant case, the previously described default in the Heritage Mortgage was created by an "ipso facto" provision, the Court must determine whether or not the Heritage Agreement constituted a "financial accommodation" within

---

**13.** Section 365(a) provides:

(a) Except as provided in section 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a).

**14.** Section 365(c)(2) provides:

(c) The Trustee may not assume or assign an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(2) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue security of the debtor[.]

11 U.S.C. § 365(c)(2).

the meaning of § 365(c)(2) and § 365(e)(2)(B) in order to determine whether the agreement would have been capable of assumption by the Trustee under § 365(a).

■ The legislative history of § 365(c)(2) suggests that Congress intended the terms "loan," "debt financing," or "financial accommodations," to be strictly construed and not to extend "to an ordinary contract to provide goods and services that has incidental financial accommodations or extensions of credit." 2 COLLIER ON BANKRUPTCY, § 365.-05[1] (15th ed. 1989), *citing,* 124 Cong.Rec. H11,093 (daily ed. Sept. 28, 1978). The term "financial accommodations" has been defined by several courts as the extension of money or credit to accommodate another. *See Transamerica Commercial Finance Corp. v. Citibank, N.A. (In re Sun Runner Marine, Inc.,),* 945 F.2d 1089, 1092 (9th Cir.1991), *citing, Government National Mortgage Corp. v. Adana Mortgage Bankers, Inc. (In re Adana Mortgage Bankers, Inc.),* 12 B.R. 977, 986 (Bankr.N.D.Ga.1980); *Wegner Farms Co. v. Merchants Bonding Co. (In re Wegner Farms Co.),* 49 B.R. 440 (Bankr.N.D.Iowa 1985); *In re Placid Oil Co.,* 72 B.R. 135 (Bankr.N.D.Tex.1987).

■ The language of the statute seems to contemplate a broader definition of "financial accommodations" than merely extending credit or making new loans. By its terms, § 365(c)(2) is applicable to a "contract to make a loan, *or* extend other debt financing *or* financial accommodations...." 11 U.S.C. § 365(c)(2) (emphasis supplied). If Congress intended the statutory exception to include only contracts extending new credit or making new loans, then Congress would have confined the language to meet this end. This Court defers to the principle that "all words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous." *In re Wang Laboratories, Inc.,* 164 B.R. 401, 404 (Bankr.D.Mass.1994), *quoting, United States v. Ven–Fuel, Inc.,* 758 F.2d 741, 752 (1st Cir.1985); *Breest v. Cunningham,* 752 F.2d 8, 9 (1st Cir.1985). Congress undoubtedly envisioned a more expansive meaning of "financial accommodations" than the extension of credit or making of loans. This Court believes that a pre-petition workout agreement should be included in its definition.

■ In the case of *In re TS Industries, Inc.,* 117 B.R. 682 (Bankr.D.Utah 1990), that court agreed that a pre-petition workout agreement was a "financial accommodation" within the meaning of § 365(c)(2). Chief Judge Clark recognized that under normal circumstances such agreements should not be assumable:

> [t]he financial circumstances of the debtor are of course fundamental considerations in any credit contract.... Presumably these circumstances were assessed in entering the contract. The risk of bankruptcy was accounted for, but that risk had not yet matured before the loan was made. Bankruptcy dramatically alters the assumption under which the contract was arranged. Independent of any contract terms, Section 365 adopts the optimal remedy from the creditor's standpoint. The creditor is then allowed to reassess the desirability and terms for offering credit in light of its changed circumstances.

*In re TS Industries, Inc.,* 117 B.R. at 687, *citing,* Nimmer, *Executory Contracts in Bankruptcy: Protecting the Fundamental Terms of the Bargain,* 54 Univ.Colo.L.Rev. 506, 533–34, 536 (1983) (footnotes omitted). In *TS Industries, Inc.,* the parties entered into a workout[15] which not only contemplated bankruptcy, but also bargained for terms which were to be incorporated in a plan of reorganization. 117 B.R. at 687. In view of

---

**15.** The workout entered into by TS Industries, Inc. clearly contemplated the commencement of bankruptcy proceedings by providing:

> WHEREAS, TS, together with its operating subsidiaries Thermal Systems, Inc., and Thermal Systems of Utah, Inc. (which subsidiaries are hereafter collectively referred to as "Thermal") *plan to file in the near future petitions for reorganization under Chapter 11* of the Federal Bankruptcy Code and in connection therewith to seek Bankruptcy Court approval of the sale to Firestone Tire and Rubber Company ... of the assets of TS and Thermal used in production of foam insulation products.

117 B.R. at 684. (emphasis supplied).

the parties' expectation of financing a reorganized debtor-in-possession, the court concluded that § 365(c)(2) did not bar assumption of the contract. *Id.*

■ Unlike the pre-bankruptcy workout in *TS Industries, Inc.*, the Heritage Agreement did not anticipate that the Debtor would commence bankruptcy proceedings. In fact, the "ipso facto" provision contained in the Heritage Mortgage covenants (and incorporated by reference in the Heritage Agreement) clearly reflects the bank's intention not to honor the agreement in the event of a bankruptcy filing. Accordingly, this Court finds that the exception carved out by the *TS Industries, Inc.* case (a workout agreement anticipating a subsequently filed bankruptcy case) would not apply to the Heritage Agreement pursuant to § 365(c)(2) and § 365(e)(2)(B). *See Id.*, 117 B.R. at 687.[16]

■ Since the Heritage Agreement would not be capable of assumption by the Trustee, the Debtor's failure to list this nonassumable contract does not satisfy the "materiality" requirement under § 727(a)(4)(A).

■ Finally, it is true that there may have been a misstatement on the bankruptcy schedules. The indebtedness to Heritage was listed in Schedule "F" of the bankruptcy schedules in the amount of $460,000 and listed as "fixed and liquidated". It was not appropriately listed. On the date of the filing of the petition, by virtue of the filing of the case, the Heritage Agreement was in default and the full indebtedness revived, *but* subject to a fifteen (15) day cure period.[17] The indebtedness was, therefore "contingent" and not "fixed and liquidated". However, that mischaracterization should not be sufficient to deny discharge. Firstly, although the Debtor had an affirmative obli-

gation to advise the Trustee on the bankruptcy schedules (or in some other way) that the debt to Heritage was affected by the Heritage Agreement, the mischaracterization, under the circumstances, was hardly material. The Trustee, himself the product of the bankruptcy filing, could have done nothing to cure the default. Therefore, any rights of the Trustee under the Heritage Agreement were illusory. Secondly, while on the one hand a debtor has an affirmative duty to make full disclosure, so also should a debtor not be put at risk that discharge will be denied by a mischaracterization which is esoteric. Under the circumstances, having weighed the evidence, including the testimony of the Debtor, the Court can not find, by a preponderance of the evidence, that the Debtor's mischaracterization of the Heritage Agreement in Schedule "F" was "knowing and fraudulent".

### (b) Counts under § 727(a)(2)(B) and § 727(a)(4)(D)

■ Because this Court has determined that the Heritage Agreement was of no value to the Trustee, the Trustee was, during all relevant periods, acting on substantially correct information relative to the financial status of the Campground. The Trustee never asked for any turnover of the records or proceeds derived from the Campground, because the Campground was fully encumbered. Therefore, it would be inequitable to deny the Debtor's discharge for failing to make a turnover that was never requested. *Cf. In re Robson*, 154 B.R. 536, 540 (Bankr. E.D.Ark.1993) (debtors knowingly and fraudulently withheld recorded information specifically requested of them by the court); *Wortman v. Ridley (In re Ridley)*, 115 B.R. 731, 737 (Bankr.D.Mass.1990) (denial of discharge under § 727(a)(4)(D) was warranted where

---

**16.** However, even if the Court were to find that the Heritage Agreement was not a "financial accommodation" within the meaning of § 365(c)(2) and § 365(e)(2)(B), the Court, on public policy grounds, would not be inclined to compel a financing institution to honor a prepetition workout which incorporates a provision providing for default in the event of bankruptcy. The Court should encourage rather than discourage pre-petition workout agreements that are designed to avoid the necessity of a bankruptcy

case. The legislative history of the Bankruptcy Code supports a strong policy favoring pre-petition workout agreements. H.R.Rep. No. 595, 95th Cong., 1st Sess. 220 (1977).

**17.** Paragraph (3) of the Heritage Agreement provides a fifteen (15) day cure period in the event of default. Therefore, despite the filing of the petition, termination of the agreement could not have occurred for another fifteen (15) days.

debtor intentionally and deliberately refused to provide documents). Accordingly, judgment should be granted for the Defendant under Count II and Count IV of the Complaint.

### III. CONCLUSION

■ Notwithstanding judgment granted in favor of the Defendant, the Court cautions that the thrust of this decision is grounded on the anomaly of the appropriate disclosure' on bankruptcy schedules of a pre-petition workout agreement.

> Sworn statements filed in any court must be regarded as serious business. In bankruptcy administration, the system will collapse if debtors are not forthcoming.... The law, fairly read, does not countenance a petitioner's decision to play a recalcitrant game, one where the debtor hides, and the trustee is forced to go seek.

*Tully,* 818 F.2d at 111. *Mascolo, Tully* and *Burgess* continue to stand for the proposition that a knowing, fraudulent and material omission of disclosure is grounds for denial of discharge. However, such an omission must be "real and substantial, not merely technical and conjectural." *Tully,* 818 F.2d at 110, *quoting, Dilworth v. Boothe,* 69 F.2d 621, 624 (5th Cir.1934).

Accordingly, the Court finds in favor of the Defendant on Counts II, IV and V of Plaintiff's Complaint. The foregoing constitutes findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52, made applicable to bankruptcy proceedings pursuant to Fed. R.Bankr.P. 7052.